Sandra M. LECTION, Appellant,

v.

Louis DYLL, M.D., Appellee.

No. 05–98–01089–CV.

Court of Appeals of Texas, Dallas.

June 20, 2001.

---

Ben C. Martin, Law Office of Ben C. Martin, Dallas, for Appellant.

Michelle E. Robberson, Paige A. Lueking, Cooper & Scully, PC, Dallas, for Appellee.

Before Justices LAGARDE, MOSELEY, and FITZGERALD.

## OPINION ON REHEARING

FITZGERALD, Justice.

We grant appellant's motion for rehearing, withdraw our October 30, 2000 opinion, and vacate the October 30, 2000 judgment. The following is now the opinion of the Court.

Sandra M. Lection appeals the take-nothing summary judgment rendered against her in her suit for medical malpractice against Louis Dyll, M.D. This case was heard in the trial court by Judge Sheehan sitting for Judge Anne Ashby. Lection contends the trial court committed procedural error in reconsidering Dyll's motion for summary judgment and challenges the court's determination that no doctor-patient relationship existed between Dyll and her. On original submission, we affirmed the trial court's judgment. We have re-examined the relevant facts and pertinent authorities relating to the physician-patient relationship and conclude that Dyll failed to sustain his summary judgment burden to prove he owed no duty to Lection. Accordingly, we reverse the judgment of the trial court and remand for further proceedings.

## FACTUAL BACKGROUND

On August 15, 1992, Lection was taken by ambulance to the emergency room of The Medical Center of Mesquite with symptoms of slurred speech, hemiparesis, severe headache, dizziness, and other neurological symptoms. Dr. Nabeel Syed, the emergency room physician on duty, examined Lection, had an EKG and CT-scan performed, and then requested a nurse to page the neurologist on call. At about 7:00 p.m., Dyll, who was the neurologist on call that day, telephoned the emergency room to speak with Syed. After Syed gave Dyll the results of Syed's examination and testing, Syed asked Dyll if anything further needed to be done. Dyll responded that "no further treatment needed to be done for this patient at the time," that "it sounded like she had a hemiplegic migraine" and that "nothing further needed to be done," which included admission into the hospital. According to both Syed and Dyll, during this telephone conversation, a nurse told Syed that Lection "was no longer in the room" and he so informed Dyll. When Syed told Dyll the patient had left the hospital and asked Dyll "is that okay," Dyll said it was all right that the patient had gone home. Syed stated that "admission would be based on what Dyll had told" him, and that he could have contacted the patient to return "if it needed to be done," but "based on her [Lection's] physical find-

ings, what Dr. Dyll had told me [Syed], and how she was at the time she left the hospital, [Syed] didn't think she needed to come back or be admitted." Had the patient still been at the hospital, Syed would have discharged her based on what Dyll said. Dyll also told Syed to "just have her come back to my office on Monday."

A factual dispute exists whether Lection left the hospital during or after Syed's telephone conference with Dyll. According to the doctors, Lection left before being discharged and while the two doctors were speaking on the phone. However, Syed stated in his deposition that he was waiting to hear from the neurologist and the cardiologist before making a decision on the correct course of treatment, and that what he (Syed) ultimately decided to do depended upon what Dyll told him to do. Syed told Lection and her husband that he wanted to hear from the neurologist before making a decision about discharge. Lection and her husband testified by deposition that Syed told Lection to go home over their objection and that Syed said Lection only had a "hysterical migraine" or something to that effect. Lection argues that Syed must have said she had a "hemiplegic migraine," thus relating Dyll's diagnosis to her and proving she did not leave the hospital until after Syed had concluded his telephone consultation with Dyll.

The hospital records contain conflicting entries concerning whether and when Lection was discharged from the hospital. The emergency physician record shows Dyll as the "consulted physician," provides the diagnosis of "TIA / Headache—hemiplegic migraine," [1] and describes the treatment plan: "(1) Discharge. See Dr. Kuboli/Deal [Dyll?] in the office on Monday. (2) Return to ER if sx worsen." The treatment record indicates the "Time ED Release" as 6:40 p.m., which was before Dyll's call. The emergency room progress notes state that at 6:15 p.m., Lection was "for discharge as per Dr. Syed—pending call fr. Dr. Jishi," [2] Lection's IV was "dc'd," she was "off monitor," and she had stated she was "feeling better"; at 6:55 p.m., Lection was "awaiting disposition"; at 7:00 p.m., Dyll called and talked to Syed; and at 7:10 p.m., Lection "not in bed—left [without] signing for discharge instructions." At 7:30 p.m., the nurse called Lection at home and left a message. The 8:15 p.m. entry reads: "daughter Chris called back—instructions given via the phone—Dr. Dyll/Koholi's tel. # given—Pt doing better—just having a little headache." The next morning, Lection suffered a disabling stroke.

In his motion for summary judgment, Dyll alleged no physician-patient relationship existed because Lection left the hospital and Dyll's telephone conference with Syed did not create any duty of care to Lection. In response, Lection asserted that Dyll breached the standard of care for an on-call doctor by making an inappropriate diagnosis, failing to obtain adequate information from Syed to make a proper diagnosis, improperly instructing Syed, and failing to admit Lection to the hospital for evaluation and treatment.

---

1. According to Syed's deposition testimony, "TIA" stands for "transient ischemic attack," which "is if you have neurologic deficits lasting a period of less than 24 hours." A neurologic deficit "could be anything. It could be weakness in an arm. It could be, you know, weakness in a leg ..., slurred speech. It could be fainting."

2. Dr. Jishi was the on-call cardiologist. Jishi had not returned Syed's call before Lection left the hospital. Syed testified in his deposition that he did not instruct the nurse at 6:15 p.m. to prepare Lection for discharge because he was still waiting to hear from Dyll and Jishi before discharging Lection.

The trial court denied Dyll's motion for summary judgment in April 1996. Dyll filed a motion for reconsideration, and Lection filed a response with supplemental summary judgment evidence. In May 1998, the trial court reconsidered, and granted, Dyll's motion for summary judgment.

In her sole issue on appeal, Lection asserts the trial court erred in granting Dyll's motion for summary judgment.

## STANDARD OF REVIEW

■ We review a summary judgment de novo. *See Reynosa v. Huff,* 21 S.W.3d 510, 512 (Tex.App.—San Antonio 2000, no pet.); *Dickey v. Club Corp. of Am.,* 12 S.W.3d 172, 175 (Tex.App.—Dallas 2000, pet. denied). The standards for reviewing a traditional summary judgment are well established. *See Sysco Food Servs. v. Trapnell,* 890 S.W.2d 796, 800 (Tex.1994); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). In deciding whether there was a fact issue raised to preclude summary judgment, we accept all evidence favorable to the nonmovant as true, indulge the nonmovant with every favorable reasonable inference, and resolve any doubt in the nonmovant's favor. *See Nixon,* 690 S.W.2d at 548–49. We disregard all conflicts in the evidence and accept as true all evidence supporting the nonmovant. *See Fought v. Solce,* 821 S.W.2d 218, 219 (Tex.App.—Houston [1st Dist.] 1991, writ denied). All doubts as to the existence of a genuine issue as to a material fact are resolved against the movant. *See id.* (citing *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex.1965)).

For a defendant to prevail on summary judgment, he must show there is no genuine issue of material fact concerning one or more essential elements of the plaintiff's cause of action or establish each element of an affirmative defense as a matter of law. *See* Tex.R.Civ.P. 166a(c); *see Black v. Victoria Lloyds Ins. Co.,* 797 S.W.2d 20, 27 (Tex.1990). Only after the defendant produces evidence entitling him to summary judgment does the burden shift to the plaintiff to present evidence raising a fact issue on the elements negated. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979); *Muckelroy v. Richardson Indep. Sch. Dist.,* 884 S.W.2d 825, 828 (Tex.App.—Dallas 1994, writ denied).

■ The affidavit of an interested witness can support summary judgment if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. *See* Tex. R.Civ.P. 166a(c); *Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex.1991); *Republic Nat'l Leasing Corp. v. Schindler,* 717 S.W.2d 606, 607 (Tex.1986); *Perez v. Cueto,* 908 S.W.2d 29, 31 (Tex.App.—Houston [14th Dist.] 1995, no writ). The phrase "could have been readily controverted" means "the testimony at issue is of a nature which can be effectively countered by opposing evidence." *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989); *see* Tex. R.Civ.P. 166a(c). Self-serving statements in affidavits of interested witnesses concerning their state of mind are uncontrovertible because "the mental workings of an individual's mind are matters about which adversaries have no knowledge or ready means of confirming or controverting." *Lukasik v. Blue Haven Pools,* 21 S.W.3d 394, 399 (Tex.App.—San Antonio 2000, no pet.) (quoting *Hayes v. E.T.S. Enters., Inc.,* 809 S.W.2d 652, 657 (Tex. App.—Amarillo 1991, writ denied)); *see Dean v. Lowery,* 952 S.W.2d 637, 640 (Tex. App.—Beaumont 1997, pet. denied); *Allied Chem. Corp. v. DeHaven,* 752 S.W.2d 155, 158 (Tex.App.—Houston [14th Dist.] 1988,

writ denied); *Bankers Commercial Life Ins. Co. v. Scott*, 631 S.W.2d 228, 231 (Tex. App.—Tyler 1982, writ ref'd n.r.e.).

## Hospital By–Laws

Before we can determine the merits of the trial court's ruling on Dyll's motion for summary judgment, we must determine what evidence was properly before the trial court. Dyll asserts that the Hospital By–Laws and "Rules and Regulations of the Medical Staff" were not competent summary judgment evidence because Lection did not present the trial court with a properly authenticated copy of the by-laws. Attached to Lection's March 25, 1996 "Supplemental Response" to Dyll's motion for summary judgment and her May 13, 1998 response to Dyll's motion to reconsider his motion for summary judgment are copies of the by-laws and rules and affidavits from Lection's attorney stating the by-laws and rules were obtained in response to Plaintiff's First Request for Production of Documents to the Medical Center of Mesquite as true and correct copies of the by-laws and rules. Lection's April 1, 1996 amended response to the motion for summary judgment refers to the hospital by-laws and rules. Discovery products not on file with the clerk may be used as summary judgment evidence if copies of the material or a notice containing specific references to the discovery are timely filed and served on all parties together with a statement of intent to use the specified discovery as summary judgment proofs.[3] Tex.R.Civ.P. 166a(d). In this case, Lection complied with the rule by serving the documents on Dyll and filing them in the trial court attached to Lection's response to the motion for summary judgment. Lection filed the documents more than seven days before the hearing on the motion for summary judgment.

■ Dyll also asserts that the court could not consider the by-laws and rules attached to the March 25, 1996 supplemental response to Dyll's motion for summary judgment because they were not filed at least seven days before the court's original hearing of his motion for summary judgment on April 8, 1996 and were not properly before the trial court. The by-laws and rules were attached to Lection's supplemental response to the motion for summary judgment and were filed fourteen days before the April 8, 1996 hearing. However, on April 1, 1996, seven days before the hearing, Lection filed an amended response, which did not have the by-laws and rules attached. Dyll argues the amended response without the by-laws and rules supplanted the supplemental response so that the by-laws and rules were not before the trial court on April 8, 1996 when it ruled on and denied Dyll's motion for summary judgment. Although Lection filed a copy of the by-laws and rules fifteen days before the hearing at which the trial court granted Dyll's motion for summary judgment, Dyll argues the by-laws and rules were not properly before the trial court because his motion to reconsider his motion for summary judgment was essentially a motion for new trial, and Lection could not present new evidence on a motion for new trial without leave of court. *See Rabe v. Guar. Nat'l Ins. Co.*, 787 S.W.2d 575, 579 n. 1 (Tex.App.—Houston [1st Dist.] 1990, writ denied) (citing *Hill v. Bellville Gen. Hosp.*, 735 S.W.2d 675, 677 (Tex.App.—Houston [1st Dist.] 1987, no

---

**3.** The documents are timely filed if filed at least twenty-one days before the summary judgment hearing if they are to be used to support the summary judgment and at least seven days before the hearing if they are to be used to oppose the summary judgment. *See* Tex.R.Civ.P. 166a(d).

writ)). *Rabe* and *Hill* involved a *post-judgment* motion for rehearing after the trial court had *granted* a motion for summary judgment. This motion for rehearing was considered "the equivalent of a motion for new trial." *Id.* These authorities do not support Dyll's argument that a motion to reconsider the *denial* of a motion for summary judgment is the equivalent of a motion for new trial. In the procedural posture of this case, the motion to reconsider the denial of the motion for summary judgment was simply a reassertion of the motion for summary judgment. It was not a motion for new trial, i.e., a "post-judgment motion which, if granted, would result in a substantive change in the judgment." *United States Fire Ins. Co. v. State,* 843 S.W.2d 283, 284 (Tex.App.—Austin 1992, writ denied) (quoting *Miller Brewing Co. v. Villarreal,* 822 S.W.2d 177, 179 (Tex.App.—San Antonio 1991), *rev'd on other grounds,* 829 S.W.2d 770 (Tex.1992)). The trial court's May 28, 1998 order did not grant Dyll's "motion to reconsider"; it considered and granted Dyll's "motion for summary judgment." Lection attached another copy of the by-laws and rules to her May 13, 1998 response to Dyll's motion to reconsider his motion for summary judgment, which was fifteen days before the May 28, 1998 hearing at which the trial court granted Dyll's motion for summary judgment. Because a copy of the by-laws and rules were on file with the trial court more than seven days before the May 28, 1998 hearing at which the trial court granted Dyll's motion for summary judgment, we conclude Dyll's arguments that the hospital by-laws and rules were not timely filed or were otherwise not properly before the trial court lack merit.

Accordingly, we conclude that the trial judge properly considered the by-laws and rules as summary judgment evidence. *See McConathy v. McConathy,* 869 S.W.2d 341, 342 (Tex.1994) (per curiam).

■ Moreover, because the alleged defects in Lection's offer of the by-laws and rules as summary judgment evidence were defects of form rather than substance, Dyll had to object in the trial court to these defects and obtain a ruling from the trial court on the objections to preserve error. *See* Tex.R.Civ.P. 166a(f); *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 343 n. 7 (Tex.1993); *St. Paul Ins. Co. v. Mefford,* 994 S.W.2d 715, 721 (Tex.App.—Dallas 1999, pet. denied); *Roberts v. Friendswood Dev. Co.,* 886 S.W.2d 363, 365 (Tex.App.—Houston [1st Dist.] 1994, writ denied). Although Dyll filed objections with the trial court, he did not obtain a ruling from the trial court and, thus, he waived the objections. *See* Tex.R.App.P. 33.1(a); *St. Paul Ins. Co.,* 994 S.W.2d at 721. Accordingly, we conclude the by-laws and rules were competent summary judgment evidence properly before the trial court.

### DUTY OF AN "ON CALL" PHYSICIAN

Dyll's sole ground for summary judgment is that he owed no duty to Lection because no physician-patient relationship existed. Lection asserts on appeal that Dyll failed to prove as a matter of law that he had no duty towards her.

### Physician–Patient Relationship

■ A plaintiff must prove four elements in a medical malpractice cause of action in order to prevail: (1) a duty by the physician to act according to a certain standard; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. *See Day v. Harkins & Munoz,* 961 S.W.2d 278, 280 (Tex.App.—Houston [1st Dist.] 1997, no pet.); *White v. Wah,* 789 S.W.2d 312, 315 (Tex.App.—

Houston [1st Dist.] 1990, no writ). The existence of a duty is a threshold question of law which must be decided before the issue of standard of care arises. *See St. John v. Pope,* 901 S.W.2d 420, 424 (Tex. 1995); *Bird v. W.C.W.,* 868 S.W.2d 767, 769 (Tex.1994).

A physician is liable for malpractice or negligence only where there is a physician-patient relationship as a result of a contract, express or implied, that the doctor will treat the patient with proper professional skill, and there is a breach of professional duty to the patient. *See Salas v. Gamboa,* 760 S.W.2d 838, 840 (Tex. App.—San Antonio 1988, no writ). The creation of the physician-patient relationship does not require the formalities of a contract. *See St. John,* 901 S.W.2d at 424. A contract implied in fact "arises from the acts and conduct of the parties, it being implied from the facts and circumstances that there was a mutual intention to contract." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.,* 480 S.W.2d 607, 609 (Tex.1972); *Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 569 (Tex.App.—Dallas 1989, no writ). Moreover, the fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship. *See St. John,* 901 S.W.2d at 423. Likewise, physical contact between a doctor and patient is not necessary to create a physician-patient relationship.[4] *See Dougherty v. Gifford,* 826 S.W.2d 668, 674 (Tex.App.—Texarkana 1992, no writ) (physician-patient relationship existed between patient from whom biopsy was taken and doctors at laboratory who examined tissue from biopsy and negligently misdiagnosed malignant cancer); *see also Bovara v. St. Francis Hosp.,* 298 Ill.App.3d 1025, 233 Ill.Dec. 42, 700 N.E.2d 143, 147 (1998) (physicians who provided service to hospital of determining whether patients were "candidates" for angioplasty procedure had physician-patient relationship with patient even though they never examined patient); *cf.* Tex.Rev.Civ.Stat. Ann. art. 4590i, § 1.03(a)(2) (Vernon Supp. 2001) (defining "Health care" as "any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement"). A physician may agree in advance with a hospital to the creation of a physician-patient relationship that leaves him no discretion to decline treatment of the hospital's clients. *See St. John,* 901 S.W.2d at 424; *Day,* 961 S.W.2d at 281 (citing *St. John,* 901 S.W.2d at 423 for proposition "that a doctor-patient relationship may be created if the physician's contract with a hospital leaves the physician without discretion to decline treatment of the hospital's client"); *cf. Hand v. Tavera,* 864 S.W.2d 678, 680 (Tex.App.—San Antonio 1993, no writ) (patient's health care plan created physician-patient relationship

4. However, physical contact, standing alone, is not sufficient to create a physician-patient relationship. A doctor's examination of a person solely for the benefit of a third party, such as to determine the person's fitness for employment or extent of disability for a worker's compensation claim, does not create a physician-patient relationship. *See Ramirez v. Carreras,* 10 S.W.3d 757, 762 (Tex.App.—Corpus Christi 2000, pet. denied); *Almaguer v. Jenkins,* 9 S.W.3d 835, 838 (Tex.App.—San Antonio 1999, no pet.); *Wilson v. Winsett,* 828 S.W.2d 231, 232–33 (Tex.App.—Amarillo 1992, writ denied); *Johnston v. Sibley,* 558 S.W.2d 135, 137–38 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.); *Lotspeich v. Chance Vought Aircraft,* 369 S.W.2d 705, 709 (Tex. Civ.App.—Dallas 1963, writ ref'd n.r.e.). In those situations, no physician-patient relationship exists because the examination is not performed for the benefit of the examinee or for the purpose of providing treatment for the examinee. *See Johnston,* 558 S.W.2d at 137–38.

when physician consulted was the designated doctor for the health care plan).

■■■■ A physician who is not under a contractual obligation with a hospital to provide services and who is not required to be "on call" to maintain staff privileges owes no general duty to emergency room patients. *See Fought,* 821 S.W.2d at 220. When no contractual obligation exists, the mere fact that a doctor is on call does not, in itself, create a physician-patient relationship or impose any duty on the doctor to treat the patient. *See St. John,* 901 S.W.2d at 424; *see also Day,* 961 S.W.2d at 281; *Ortiz v. Shah,* 905 S.W.2d 609, 611 (Tex.App.—Houston [14th Dist.] 1995, writ denied).

■■■ If, as in this case, no prior relationship exists between physician and patient, an on-call physician may assume a duty to the patient if he takes *some affirmative action* to treat [5] the patient.[6] *See Reynosa,* 21 S.W.3d at 513; *Day,* 961 S.W.2d at 280; *Wheeler v. Yettie Kersting Mem'l Hosp.,* 866 S.W.2d 32, 37–40 (Tex. App.—Houston [1st Dist.] 1993, no writ). An on-call physician to an emergency room consulted by telephone renders medical services by evaluating the information provided and making a medical decision. *See Wheeler,* 866 S.W.2d at 39–40.

## Summary Judgment Evidence

The summary judgment evidence shows Lection arrived by ambulance at the hospital's emergency room at 1:50 p.m. complaining of slurred speech, slight paralysis, severe headache, and other neurological symptoms. Syed examined Lection at about 6:00 p.m., by which time, according to the medical records and Syed's testimony, Lection's condition had improved to where her speech was no longer slurred and the weakness in her leg was improved. Before deciding on a diagnosis and determining whether to admit Lection to the hospital, Syed wanted to consult with the on-call neurologist, Dyll. The hospital paged Dyll. When Dyll telephoned Syed, Syed explained Lection's current condition to Dyll.[7] During Syed's explanation of Lection's condition to Dyll, a nurse informed Syed that Lection had left "the room." Syed informed Dyll of Lection's departure, and he finished explaining his evaluation and treatment of Lection. Syed asked Dyll, "is it all right that the patient is no longer here ... and do I need to do any-

---

5. In defining "treatment," courts have looked to various dictionary definitions. *See Thomas v. State,* 923 S.W.2d 645, 648 (Tex.App.—Houston [1st Dist.] 1995, no pet.) (citing Black's Law Dictionary); *Powers v. Floyd,* 904 S.W.2d 713, 717 (Tex.App.—Waco 1995, writ denied) (citing Merriam Webster's Collegiate Dictionary). Webster's Dictionary defines "treatment" as "the action or manner of treating a patient medically or surgically." WEBSTER'S THIRD NEW INT'L DICTIONARY 2435 (1981). It defines the verb "treat" as "to care for (as a patient or part of the body) medically or surgically." *Id.* Black's Law Dictionary defines "Treatment" as, "A broad term covering all the steps taken to effect a cure of an injury or disease; including examination and diagnosis as well as application of remedies." BLACK'S LAW DICTIONARY 1502 (6th ed.1992). Although the word "treatment" is not defined in article 4590i, the word is used to define such key terms as "Health care" and "Health care liability claim." *See* TEX.REV.CIV.STAT. ANN. art. 4590i, § 1.03(2), (4) (Vernon Supp. 2001).

6. In *Hand,* the San Antonio Court of Appeals appears to require both a contractual obligation towards the patient and affirmative acts toward treatment. *See* discussion *infra* at pp. 712–13.

7. Syed's description to Dyll of Lection's current condition was based entirely on his own examination of Lection. Syed did not inform Dyll of the observations of other hospital personnel, including the "paralysis" purportedly observed by an emergency medical technician who had examined Lection several hours before Syed examined her.

thing further." Dyll told Syed that Lection had a hemiplegic migraine, "no further treatment needed to be done for this patient at the time," and "just have her come back to my [Dyll's] office on Monday." Lection testified that Syed told her he was waiting to talk to the neurologist before determining whether to admit her and that Syed later told her to go home. Lection was not able to get dressed without help or walk unassisted when she left the hospital. The nurse called Lection's home, and when Lection's daughter called back, the nurse informed her of the discharge instructions and of Dyll's telephone number.

Under the Hospital By–Laws, as a requirement of maintaining active staff privileges, Dyll was required to serve as an on-call physician to the emergency room. An active staff member has the prerogative to admit patients to the hospital and is obligated to participate in patient assessments and provide emergency medical care to a patient in the emergency room. The on-call physician makes the determination whether an emergency-room patient should be admitted to the hospital,[8] but he is not required to provide further treatment to the patient if the patient is not admitted to the hospital. The hospital rules and regulations also provide that a consultation is required in all cases where the diagnosis is obscure and where there is doubt as to the best therapeutic measures to be taken for a patient.

### Dyll's Factual Arguments

Dyll asserted in his motion for summary judgment that the summary judgment evidence proves as a matter of law that no physician-patient relationship was formed

between him and Lection because: (a) no opportunity existed for the formation of the relationship due to Lection's departure from the hospital; (b) he made no affirmative acts toward treating her; and (c) the Hospital By–Laws did not create a contractual physician-patient relationship. We consider each of these assertions in turn.

Dyll first argues the evidence proves he had no opportunity to form a physician-patient relationship with Lection because she left the hospital before he uttered a word to Syed. He cites to statements in his deposition asserting that he did not have the opportunity to form any opinion of Lection's diagnosis or to "get into the decision-making process in my mind about what this patient had" because Lection had already left the hospital. Dyll's statements that he made no determination of her condition and did not participate in the decision-making process is contradicted by Syed's evidence that Dyll told him Lection had a hemiplegic migraine, that it was "all right" for Lection to have left the hospital, that no immediate treatment was necessary, and for Syed to send Lection to his office on Monday. The evidence is disputed as to whether Lection had left the hospital when Dyll spoke to Syed. The medical records show a ten-minute gap between Dyll's call to Syed and the nurse's observation that Lection was "not in bed" and had left without signing for the discharge instructions. Syed testified he would not have discharged Lection without speaking to Dyll, and Lection and her husband testified they did not leave until Syed *personally* told them to "go home."

---

8. Different witnesses testified that Syed, as an emergency room physician, did not have authority to admit Lection without an on-call physician's approval. Although the Hospital

By–Laws appear to give emergency room physicians this authority, we must resolve controverted factual issues in Lection's favor.

■ The summary judgment standard requires us to resolve all factual disputes in favor of the nonmovant. Having reviewed the summary judgment evidence applying this standard, we conclude that a fact issue exists whether Lection was still an emergency room patient when the telephone consultation occurred. Although Dyll's affidavit indicates he was led to believe the patient had gone and Syed's inquiry had become moot, the affidavit of an interested witness concerning his state of mind cannot be readily controverted and is not proper summary judgment evidence. *See Lukasik*, 21 S.W.3d at 399; *Hayes*, 809 S.W.2d at 657. Moreover, indulging every reasonable inference in Lection's favor, as we must, we conclude there is circumstantial evidence that contradicts Dyll's affidavit. *See Nixon*, 690 S.W.2d at 548–49. According to Syed's deposition, Dyll instructed Syed to have the patient call Dyll's office on Monday. This is "some evidence" either that Dyll believed the patient was still at the hospital or that she could be readily contacted. The hospital records note a ten-minute interval between the Dyll Syed telephone call and Lection's absence from the emergency room. The hospital record does not state that Lection left without being discharged, but only that she failed to sign for the discharge instructions. Lection and her husband's testimony that Syed told them to "go home" is some evidence that Lection was discharged, and Syed testified several times he would not have discharged Lection without having first consulted Dyll. Contrary to Dyll's assertions, the evidence does not conclusively prove no opportunity existed for the formation of a physician-patient relationship.

■ Dyll next asserts that the evidence conclusively establishes that he made no affirmative acts toward treating Lection. Dyll states that he never met or talked to Lection, examined Lection, performed any tests or reviewed any test results on her, or sent her a bill for his services. Dyll contends he merely discussed treatment alternatives with Syed as a professional colleague. The summary judgment evidence shows Syed contacted Dyll because he was the on-call neurologist who had an obligation to the hospital to assist, and not merely because Dyll was a colleague. Although Syed testified that he remained Lection's physician, there is evidence that Syed sought and relied upon Dyll's diagnosis and treatment plan. Syed testified he intended to rely on the on-call neurologist's determination of whether Lection needed to be admitted and that he could have called Lection and told her to return to the hospital for admission if necessary. The summary judgment record contains evidence that Dyll diagnosed Lection's condition, told Syed that no other treatment was necessary, and assured Syed that it was "all right" for her to have left the hospital. These statements constitute an evaluation of the information provided and a medical decision concerning Lection's need for treatment and admission to the hospital and thus are "affirmative acts" towards Lection's treatment. *See Wheeler*, 866 S.W.2d at 39–40. We conclude the summary judgment evidence does not conc̲ hat Dyll made no affirmative acts of treatment toward Lection.

■ Dyll next asserts that the Hospital By–Laws do not impose a contractual physician-patient relationship. Dyll states that the by-laws obligate an on-call physician to provide emergency care to patients in the emergency room only when (1) requested by the emergency room physician, and (2) when the medical needs of the patient fall within the scope of the on-call physician's practice, training, and abilities. Thus, Dyll concludes, the by-laws "did not

contain any absolute contractual obligation by Dr. Dyll to treat Lection" but required a request from Syed. Dyll argues that because Lection left the emergency room, Syed never requested that Dyll provide treatment or admit Lection to the hospital. The summary judgment evidence does not conclusively prove Dyll's arguments. As discussed above, the record contains conflicting evidence of whether Lection had left the hospital during the Syed–Dyll telephone call. The record also contains conflicting evidence of whether Syed requested Dyll's assistance in determining Lection's diagnosis and treatment and whether to admit her. Although Dyll testified he never discussed treatment with Syed, Syed testified that he asked Dyll, "do I need to do anything further," and Dyll told him, "no, just have her come to my office on Monday." As for the issue of whether Dyll was asked whether to admit Lection to the hospital, Syed's testimony that he asked Dyll whether it was all right for Lection to have left the hospital implicitly inquires whether she should have been admitted to the hospital. Syed's testimony shows Dyll responded to this inquiry with his opinion that "it was okay that the patient had gone home." Syed also testified that Dyll "said nothing further needed to be done, then nothing further—and that includes admission." We conclude that Dyll's arguments are not supported by the uncontroverted summary

judgment evidence. Construing all evidence in Lection's favor, the summary judgment record shows Syed requested from Dyll a diagnosis and treatment plan for Lection, and nothing in the summary judgment evidence shows that Dyll's diagnosis of hemiplegic migraine and recommendation of no further treatment was not within the scope of his practice, training, and abilities. Dyll's argument that the Hospital By–Laws do not impose a contractual physician-patient relationship lacks merit.

### Dyll's Case–Law Arguments

Dyll argues that the following Texas cases establish that no physician-patient relationship existed in this case: *St. John v. Pope*, 901 S.W.2d 420 (Tex.1995); *Reynosa v. Huff*, 21 S.W.3d 510 (Tex.App.—San Antonio 2000, no pet.); *Ortiz v. Shah*, 905 S.W.2d 609 (Tex.App.—Houston [14th Dist.] 1995, writ denied); *Lopez v. Aziz*, 852 S.W.2d 303 (Tex.App.—San Antonio 1993, no writ); *Childs v. Weis*, 440 S.W.2d 104 (Tex.Civ.App.—Dallas 1969, no writ).[9] We shall discuss each of these cases.

In *St. John v. Pope*, an emergency room physician telephoned the hospital's on-call physician, Dr. St. John, a board-certified internist, and recounted the patient's symptoms of fever, back pain, and psychosis. *See St. John*, 901 S.W.2d at 421. Because this medical condition was not

9. Dyll also relies on several out-of-state cases as supporting his assertion that no physician-patient relationship was created. *See Hill v. Kokosky*, 186 Mich.App. 300, 463 N.W.2d 265 (1990); *Giles v. Sanford Mem'l Hosp. & Nursing Home*, 371 N.W.2d 635 (Minn.Ct.App. 1985); *Cintron v. N.Y. Med. Coll. Flower & Fifth Ave. Hosps.*, 193 A.D.2d 551, 597 N.Y.S.2d 705 (N.Y.App.Div.1993) (mem.); *Fabian v. Matzko*, 236 Pa.Super. 267, 344 A.2d 569 (1975); *Lyons v. Grether*, 218 Va. 630, 239 S.E.2d 103 (1977). However, except for *Cintron*, none of these cases involves a physician on call to the emergency room who

proffered a diagnosis and recommended treatment. In *Cintron*, the on-call physician was informed the patient's labor "had become arrested," and he recommended an immediate caesarian section. *Cintron*, 597 N.Y.S.2d at 705. However, it appears the appellate court affirmed the grant of summary judgment because the patient's argument that the physician was under a duty to attend to her in the hospital was without merit. *See id.* The appellate court did not address whether the physician-patient relationship existed. *See id.* Accordingly, all of these cases are distinguishable.

within Dr. St. John's specialty and the hospital was not equipped to treat it, Dr. St. John recommended the patient be referred to another hospital with appropriate facilities and expertise. *See id.* at 422. The supreme court held that although Dr. St. John listened to the emergency room physician describe the symptoms and came to a conclusion, Dr. St. John did so in order to evaluate "whether he should take the case, not as a diagnosis for a course of treatment." *Id.* at 424. The court observed that Dr. St. John never agreed to examine or treat the patient and that the patient did not present evidence of any agreement divesting Dr. St. John of the discretion whether to treat a patient. *See id.* The court concluded that Dr. St. John established as a matter of law no physician-patient relationship existed and, therefore, no duty existed. *See id.*

The evidence in this case is quite different from *St. John.* In *St. John,* no evidence showed Dr. St. John was contractually obligated to treat the patient. *See id.* In this case, section 4.2.4 of the Hospital By Laws requires Dyll to assist emergency room physicians with their neurology patients and to treat all emergency room patients.[10] In *St. John,* the physician made no diagnosis and expressed no opinion of the appropriate treatment for the patient. Instead, he determined he lacked the skill and his hospital lacked the facility to treat the patient. In this case, Dyll diagnosed Lection's ailment, determined the necessary course of treatment (none immediately), and, instead of acknowl-

edging a lack of competence to treat the patient, as Dr. St. John acknowledged, Dyll directed Syed to send Lection to see him the following Monday for treatment. *St. John* does not support Dyll's argument that he took no affirmative actions to treat Lection.

In *Reynosa v. Huff,* Reynosa gave birth to her child by caesarian section. *See Reynosa,* 21 S.W.3d at 512. Dr. Huff was present in the operating room supervising the resident doctors performing caesarian deliveries on other patients, but Dr. Huff was not involved in Reynosa's operation. *See id.* Reynosa argued that Dr. Huff was liable for negligently supervising the doctor performing the operation on Reynosa and that his presence in the labor and delivery room "bound him to assure that [Reynosa] received adequate care." *Id.* at 513. The San Antonio Court of Appeals rejected Reynosa's arguments, stating there was no evidence to show Dr. Huff was even aware of Reynosa's presence in the labor and delivery room, and he never gave anyone advice regarding Reynosa's treatment. *See id.* The court of appeals concluded the trial court did not err in granting Dr. Huff's no-evidence motion for summary judgment because there was no evidence of a physician-patient relationship between Dr. Huff and Reynosa. *See id.*

In this case, however, there is evidence that Dyll gave Syed advice regarding Lection's treatment, namely, Dyll's diagnosis that Lection suffered from a hemiplegic

---

**10.** Section 4.2.4 of the Hospital By–Laws provides:

> Each physician member of the active staff shall serve as an on-call physician to the emergency room by participating in the emergency room call rotation. An on-call physician is obligated to provide emergency medical care to a patient in the emergency room. The on-call physician, shall, when so requested by the emergency room physi-

> cian, assume primary responsibility for the medical care of a patient requiring admission for treatment, provided that the medical needs of the patient fall within the usual scope of the physician's practice, training and abilities. The on-call physician shall not be required to provide further treatment to the patient if the patient is not admitted to the hospital.

migraine, that no further treatment was necessary at that time, and that Lection should see him on Monday. *Reynosa* does not support Dyll's argument that he owed no duty to Lection.

In *Childs v. Weis*, Daisy Childs, who had been visiting Lone Oak, went to the Greenville Hospital emergency room at about two a.m. *See Childs,* 440 S.W.2d at 105. Childs was seven months pregnant, and she complained of bleeding and labor pains. After a nurse examined her, the nurse telephoned Dr. Weis and then told Childs that the doctor had said she would have to go to her doctor in Dallas. Childs said she was not going to make it; the nurse assured her she would. An hour later, Childs had the baby while en route to a medical facility in Sulphur Springs. The baby lived only twelve hours. *See id.* Dr. Weis's affidavit stated, inter alia, that the nurse had told him Childs was visiting in Lone Oak, resided in Garland, and had her obstetrician in Garland; that he told the nurse to have Childs call her doctor in Garland and see what he wanted her to do; and that Dr. Weis knew nothing else about this incident until the lawsuit was filed. *See id.* at 106. Greenville Hospital, where Dr. Weis served on the medical staff, did not require a physician on emergency service to see all patients who appear at the emergency room. *See id.*

Childs complained on appeal of the entry of summary judgment because evidence raised a question of fact as to "whether the doctor-patient relationship was established and if so whether the doctor was negligent" in failing to personally examine and treat her and in instructing her to go to her Dallas doctor after learning of her medical condition. *Id.* This Court rejected Childs' argument that the doctor's statement to the nurse amounted to an acceptance of the case and affirmative instructions "in the nature of treatment" which she was bound to follow.[11] *See id.* at 107. We held there was no "evidence of a contract, either express or implied, which would create the relationship of patient and physician as between Dr. Weis and Mrs. Childs," and thus Dr. Weis had no duty to examine or treat her. *Id.*

*Childs* differs from the case before us because Dr. Weis refused treatment to Childs. In this case, Dyll did not refuse to treat Lection; instead, the summary judgment record contains evidence that he determined no immediate treatment was necessary, implicitly determined she did not need to be admitted to the hospital, and directed that Lection see him the following Monday. *Childs* does not support Dyll's argument that he owed no duty to Lection.

In *Ortiz v. Shah*, Ortiz was taken to the hospital emergency room with a gunshot wound to the chest. After being called by a nurse, Dr. Shah was the first available on-call physician to agree to come to the hospital. In the meantime, Ortiz died in surgery. The Houston Fourteenth District Court of Appeals held the physician's agreement to go to the hospital did not establish a doctor-patient relationship.[12]

---

11. We observed that Childs "did not interpret the relayed words to be in the nature of treatment by a doctor who had accepted the responsibility of treating her case for the simple reason that she was in the act of traveling toward Sulphur Springs, not Dallas or Garland, when the birth occurred." *Childs,* 440 S.W.2d at 108.

12. Other courts have reached this same conclusion in analogous situations. *See Tsoukas v. Lapid,* 315 Ill.App.3d 372, 248 Ill.Dec. 148, 733 N.E.2d 823, 834 (2000) (telephone call to doctor's office to schedule appointment did not create physician-patient relationship even though physician was listed in patient's health plan) (citing *Weaver v. Univ. of Mich. Bd. of Regents,* 201 Mich.App. 239, 506 N.W.2d 264, 266 (1993) (holding "that a tele-

The court emphasized that when no prior relationship with a physician exists, the physician-patient relationship is not established "until the physician takes some affirmative action toward treatment of the patient." *Ortiz*, 905 S.W.2d at 611.

Dyll cites *Ortiz* for the proposition that a contractual agreement with a hospital to be on call and treat emergency patients is not sufficient to establish a physician-patient relationship. However, in this case, the summary judgment evidence includes affirmative actions by Dyll concerning Lection's treatment, namely, Dyll's determination that no treatment was required at that time, that it was all right for Lection to have left the hospital, and that Lection should go to Dyll's office the following Monday. *Ortiz* does not support Dyll's argument that he owed no duty to Lection.

In *Lopez v. Aziz*, Lopez was admitted to Val Verde Hospital for delivery of her eleventh child and cared for by Dr. Martinez. *See Lopez*, 852 S.W.2d at 304. Dr. Martinez consulted by telephone with Dr. Aziz, an OB–GYN specialist in Uvalde, several hundred miles away. Dr. Martinez sought and followed Dr. Aziz's advice, which included laboratory workup requiring twenty-four hours to complete. Lopez began to suffer seizures and died shortly after her baby was delivered. Dr. Aziz's

affidavit related that Lopez was never his patient, and that she never sought medical treatment from him or ever contacted him or his office. Further, "*she was never referred to him* for treatment either by a private physician or an emergency room physician; [and] he never gave her any medical advice or treatment." *Id.* (emphasis added). Dr. Aziz also said he had never been associated with Dr. Martinez in any professional capacity, did not cover for him and did not share patients with him. *See id.*

The San Antonio Court of Appeals emphasized that the "essence of a medical malpractice action is the existence of a duty flowing from the physician-patient relationship" resulting from a contract, express or implied, that the physician will treat the patient with proper professional skill. Liability arises when there is a breach of professional duty to the patient. *See id.* at 305. The court recognized that article 4590i requires the physician-patient relationship must exist before a health care liability claim can be asserted. *See id.* (citing *Salas*, 760 S.W.2d at 839 n. 1). The court concluded that Dr. Aziz only answered the professional inquiry of a colleague and that there was no evidence of a physician-patient relationship "arising out of that one telephone conversation."[13]

phone call merely to schedule an appointment with a provider of medical services does not by itself establish a physician-patient relationship where the caller has no ongoing physician-patient relationship with the provider and does not seek or obtain medical advice during the conversation")), *appeal denied*, 191 Ill.2d 561, 250 Ill.Dec. 467, 738 N.E.2d 936 (2000). New York may be in disagreement. In *Bienz v. Central Suffolk Hospital*, 163 A.D.2d 269, 557 N.Y.S.2d 139 (N.Y.App.Div. 1990), the New York court held that a telephone call for the purpose of initiating treatment could be sufficient to create a physician-patient relationship. *See id.* at 139–40. However, in *Miller v. Sullivan*, 214 A.D.2d 822, 625 N.Y.S.2d 102 (N.Y.App.Div.1995),

the court held no physician-patient relationship was established when a person telephoned the doctor's office for an appointment, and the doctor, on hearing the person's symptoms, instructed the person "to see him right away." *Id.* at 104. The court acknowledged *Bienz's* holding that a physician-patient relationship can "arise" from a telephone call, but it stated that the physician-patient relationship is "created" when medical treatment is rendered. *Id.* at 103–04.

13. The holding in *Aziz* that a mere telephone consultation, standing alone, does not create a physician-patient relationship is supported by cases in other jurisdictions. *See Oliver v.*

In this case, the summary judgment record contains evidence that the Dyll–Syed conversation was more than answering the professional inquiry of a colleague. Dyll, unlike Dr. Aziz, was under a contractual obligation with the hospital to assist Syed and the other emergency room physicians with their neurology problems when Dyll was on call. Syed contacted Dyll because of his position as on-call neurologist for the emergency room, not merely as a colleague. And, unlike Dr. Aziz, who did not have the patient referred to him, Dyll requested and received a referral of Lection to him as a patient. *Lopez* does not support Dyll's argument that he owed no duty to Lection.

Although not cited by either party, we have discovered one other case in which a patient sued a "consulted" physician after leaving an emergency room without being seen by the consulted physician. *See Roberts v. Hunter*, 310 S.C. 364, 426 S.E.2d 797 (1993). In *Roberts*, Roberts was being treated by the emergency room physicians when his vision became blurred and he began to see spots before his eyes. *See id.* at 798. The emergency room physician contacted a neurologist, Dr. Hayes, who was busy seeing another patient at the hospital, but who said he would examine Roberts. The evidence was uncontroverted that Roberts left the hospital before Dr. Hayes could examine him. Roberts suffered a stroke a few hours later. The trial court rendered a directed verdict for Dr. Hayes. *See id.* at 799. Unlike this case, the opinion in *Roberts* does not suggest that Dr. Hayes proffered a diagnosis, recommended a course of treatment or approved the lack of treatment, or sought a referral of Roberts. We conclude that *Roberts* is also factually distinguishable.

**Other Cases**

Several cases are more analogous to this case than those cited by Dyll and demonstrate that Dyll failed to prove as a matter of law that no physician-patient relationship existed between him and Lection.

In *Hand v. Tavera*, Hand went to the emergency room complaining of a three-day headache. *See Hand*, 864 S.W.2d at 678. Hand told the emergency-room physician, Dr. Boyle, that he had a history of high blood pressure and that his father had died of a stroke. Dr. Boyle decided to admit Hand, but he needed the approval of Dr. Tavera, the physician responsible for admissions under Hand's health care plan, to admit Hand. Dr. Boyle telephoned Dr. Tavera and related Hand's symptoms and history to Dr. Tavera. Dr. Tavera disagreed with Dr. Boyle's recommendation for hospitalization, and Dr. Tavera concluded that Hand should be treated as an outpatient. In accordance with Dr. Tavera's instructions, Hand was sent home, where he suffered a stroke a few hours later. *See id.* at 679. The San Antonio Court of Appeals reviewed Hand's health insurance plan, under which Dr. Tavera "agrees to provide ENROLLEES with medical services which are within the normal scope of PHYSICIAN'S medical practice," and concluded the health plan created the physician-patient relationship. *Id.* at 679–80. The court stated, "We . . . hold that when a patient who has enrolled in a prepaid medical plan goes to a hospital emergency room and the plan's designated doctor is consulted, the physician-patient

---

*Brock*, 342 So.2d 1, 4 (Ala.1976); *Reynolds v. Decatur Mem'l Hosp.*, 277 Ill.App.3d 80, 214 Ill.Dec. 44, 660 N.E.2d 235, 239 (1996); *Hill*, 463 N.W.2d at 267. However, multiple telephone consultations in a short period of time concerning the same patient can be sufficient to create a physician-patient relationship with the consulted doctor. *See Gilinsky v. Indelicato*, 894 F.Supp. 86, 93 (E.D.N.Y.1995).

relationship exists and the doctor owes the patient a duty of care." *Id.* at 680.

The San Antonio Court of Appeals determined the physician-patient relationship existed because of Hand's and Dr. Tavera's relationship to the same health care plan. *Id.* That decision is an extension to health care plans of the supreme court's statement in *St. John*'s that a physician may agree with a hospital to have no discretion to decline treatment of a hospital's patients. *See St. John*, 901 S.W.2d at 424. Central to both the supreme court's statement in *St. John* and the San Antonio court's holding in *Hand* are the following two factors: (1) a contractual obligation on the physician to advise concerning treatment of emergency room patients when consulted, and (2) actual consultation of and advising by the physician.[14] In this case, the hospital was obligated to provide treatment for Lection, an emergency room patient, and Dyll was under a contractual obligation with the hospital to assist Syed in treating Lection.[15] Resolving all factual disputes against Dyll, as we must when reviewing the grant of summary judgment in his favor, the record shows that Dyll, like Dr. Tavera, was consulted by the emergency room physician concerning the patient's treatment, determined that admission to the hospital was not necessary, and the patient suffered a stroke soon after. Thus, like Dr. Tavera, the evidence supports a finding there was actual consultation of and advising by Dyll concerning Lection. Although the contractual relationship between Lection and Dyll is not identical to that between Hand and Dr. Tavera, we conclude that *Hand* is sufficiently analogous to support the conclusion that Dyll has failed to conclusively prove that no physician-patient relationship exists in this case.

In *Fenley v. Hospice in the Pines*, Fenley was advised by his physician, Dr. Todd, that he should seek pain-management treatment at a hospice because of a cyst on his brain stem. *See Fence v. Hospice in the Pines*, 4 S.W.3d 476, 478 (Tex.App.—Beaumont 1999, pet. denied). The form for admission to the hospice required Fenley's physician and the hospice's medical director, Dr. Devore, to certify that Fenley was terminally ill and was not expected to live more than six months. Dr. Todd signed the certification. Dr. Devore also signed the certification, but he did so without examining Fenley, reviewing his medical chart, or reviewing the test results

---

14. The Ohio Court of Appeals applied a similar set of requirements. That court held an on-call physician can have a physician-patient relationship with a patient about whose treatment he is consulted when the following three requirements are met: the on-call physician must (1) participate in the diagnosis of the patient's condition; (2) participate in or prescribe a course of treatment for the patient, and (3) owe a duty to the hospital, its staff, or the patient for whose benefit he is on call. *See McKinney v. Schlatter*, 118 Ohio App.3d 328, 692 N.E.2d 1045, 1050 (1997), *dism'd*, 78 Ohio St.3d 1471, 678 N.E.2d 580 (1997), *and appeal not allowed*, 79 Ohio St.3d 1421, 680 N.E.2d 158 (1998). The Michigan Court of Appeals has not set out the requirements for an on-call physician consulted by telephone to have a physician-patient relationship, but it did conclude that participation by the on-call physician in the patient's diagnosis and treatment was necessary for there to be a physician-patient relationship. *See Oja v. Kin*, 229 Mich.App. 184, 581 N.W.2d 739, 743 (1998), *appeal denied*, 459 Mich. 988, 593 N.W.2d 559 (1999).

15. *See supra* note 10. Dr. Gary Lee Tunell testified that section 4.2.4 of the Hospital By-Laws obligates an on-call physician, "if he gets a phone call, he is to promptly return the phone call and to make himself available for specialty consults with the emergency room physician.... And if he is asked something that's within his expertise, he should be available for and be able to—discuss whatever the question is with the emergency room physician...."

leading to Dr. Todd's conclusion that hospice care was appropriate. Two months after entering the hospice, Fenley suffered a ruptured colon, which was a side effect of the drugs administered at the hospice, and died. After death, it was discovered that Fenley never had any form of terminal condition. Fenley's estate and relatives sued the hospice and Dr. Devore. *See id.* The trial court granted Dr. Devore and the hospice's motion for summary judgment. One of the issues before the Beaumont Court of Appeals was whether a physician-patient relationship existed between Dr. Devore and Fenley. *See id.* at 479. The court reviewed the hospice's manual, which obligated the medical director not only to certify each patient as terminal but also to take an active role with the attending physician in the care and treatment of the hospice's patients. *See id.* at 479–80. After considering the evidence showing the medical director's required involvement in the patients' treatment, as well as the evidence of his approval of the attending physicians' treatment of Fenley, the court of appeals concluded that a physician-patient relationship existed between Dr. Devore and Fenley. *See id.* at 480. Likewise, in this case, the hospital by-laws obligated Dyll to participate in the treatment decisions of emergency room patients, and Syed's testimony shows Dyll's approval of the decision to provide no further treatment and that "nothing further needed to be done . . .—and that includes admission." *Fenley* supports the conclusion that the doctor-patient relationship exists in this case.

The decision in *Wheeler v. Yettie Kersting Memorial Hospital* is also analogous to this case. In *Wheeler*, a woman brought suit against several parties for the death of her baby who suffocated during an alleged negligent delivery by the emergency medical technicians who were transporting her ninety miles to Galveston for the delivery of her baby. *See Wheeler*, 866 S.W.2d at 35–36. Wheeler, eight months pregnant, contacted a Life Support Team to take her to John Sealy Hospital in Galveston, about ninety miles away. She was first taken to Yettie Kersting Memorial Hospital in Liberty, the nearest medical facility, for a medical assessment to determine whether she could successfully be taken to John Sealy. Among other things, a nurse contacted an on-call physician, Dr. Rodriguez, to whom she gave medical information about Wheeler. Dr. Rodriguez approved the transfer. In support of his motion for summary judgment, Dr. Rodriguez argued "Mrs. Wheeler was not even aware that the nurse telephoned him; that he had no contact or connection with Mrs. Wheeler other than the one phone call from Nurse Colvin; and that his participation in that phone call did not establish a physician-patient relationship." *Id.* at 38.

The Houston First District Court of Appeals observed that the question was not whether an on-call physician had an obligation to render services to a patient who appeared for treatment during the period of the doctor's call, as in *Childs*, but "whether Dr. Rodriguez actually rendered services to Mrs. Wheeler, thus establishing a physician-patient relationship." *Id.* at 39. Dr. Rodriguez was not requested to examine the patient nor did he do so. *See id.* But the doctor was requested to "evaluate certain information and make a medical decision whether Mrs. Wheeler could safely be transferred to John Sealy." *Id.* He willingly "agreed to do so." *Id.* at 39–40. The court concluded that "in evaluating the status of Mrs. Wheeler's labor and giving his approval, he [Dr. Rodriguez] established a doctor-patient relationship with Mrs. Wheeler and accepted the duties which flow from such a relationship." *Id.* at 40.

In this case, while Syed was actively rendering medical services to Lection in the emergency room, Syed determined he needed the advice and assistance of the hospital's neurologist who was required to serve on a rotating on-call basis. Dyll telephoned Syed in this capacity and listened to Syed's description of Lection's condition. Dyll responded with a diagnosis, he stated a medical opinion of Syed's treatment of the patient, past and future, and he suggested that Syed have the patient call Dyll the following Monday. Syed relied upon Dyll's expertise and advice and had the nurse telephone Lection's home with this information. *Wheeler* supports the conclusion that the physician-patient relationship existed in this case.

## CONCLUSION

Because Dyll failed to conclusively establish that no physician-patient relationship existed between Lection and him, we conclude the trial court erred in granting summary judgment in favor of Dyll. We resolve Lection's issue in her favor.

Because of our disposition of this issue, we need not reach Lection's assertion that the trial court erred in reconsidering its denial of Dyll's motion for summary judgment. *See* Tex.R.App.P. 47.1.

We reverse the trial court's judgment and remand the cause for further proceedings.