In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-00-00842-CV

____________


RAJA EL MAJZOUB, INDIVIDUALLY AND AS THE REPRESENTATIVE
OF THE ESTATE OF HASSAN EL MAJZOUB, DECEASED, AND AS
NEXT FRIEND OF ROJDI EL MAJZOUB AND FARAH EL MAJZOUB,
Appellant


V.


W. DOUGLAS APPLING, M.D., Appellee






On Appeal from the 11th District Court

Harris County, Texas

Trial Court Cause No. 98-48648






OPINION ON REHEARING

 We deny appellant's motion for rehearing. Tex. R. App. P. 49.3. We withdraw
our August 30, 2002 opinion, substitute this opinion in its place, and vacate our
August 30, 2002 judgment.

 In this medical malpractice case, appellant, Raja El Majzoub, individually, as
representative of the estate of her husband, Hassan el Majzoub, and as next friend of
their two children, appeals from the trial court's summary judgment in favor of
appellee, Dr. W. Douglas Appling. In one point of error, Mrs. Majzoub argues the
trial court erred in granting Dr. Appling's motion for summary judgment and in
concluding that, as a matter of law, no physician-patient relationship existed between
Appling and Mr. Majzoub before Majzoub suffered an anoxic brain injury. (1)

 We affirm.

Background

 On September 16, 1997, Mr. Majzoub, complaining of difficulty in breathing,
went to the Rosewood Medical Center emergency room at approximately 3:00 a.m.
He was placed under the care of Dr. Vasif Humayun, the emergency room physician
on duty. Dr. Humayun's physical examination of Majzoub revealed swollen lymph
nodes, inflamation of the pharnyx, enlarged, swollen tonsils covered with pus-like
exudate, and a muffled, hoarse voice. Majzoub also had stridor. (2) After examining
Majzoub, Dr. Humayun asked the nurse to telephone the on-call otolaryngologist.

 Pursuant to Rosewood procedure, its answering service telephoned Dr.
Appling, a board-certified otolaryngologist, and left a message. When Dr. Appling
returned the telephone call at 3:15 a.m., he spoke to Dr. Humayun. Dr. Appling had
never treated Majzoub. In his deposition, Dr. Appling described his telephone
conversation with Dr. Humayun, in part, as follows:

 [Dr. Humayun] told me he had seen a patient, 31-year-old obese male,
come in with sore throat. . . . He had stridor, he had tonsillitis, and he
had a positive strep test . . . .


 He then asked me how our group treated our patients with tonsillitis. 
And I replied, "Did you say he had stridor? Did you - is this guy's
airway obstructed? Is the patient in acute airway distress?"


 He said, "No, the patient's airway is not obstructed, he's not in acute
airway distress. In fact, he's walking around and he's talking, and has
normal O2 sats. on pulse oximetry."


 I said, "Well, is he having noisy breathing?" He said ["Y]es.["] I then
asked him what did he see on his exam. He said he had large, inflamed
tonsils that were almost touching. I asked him if one tonsil was larger
than the other . . . . He said ["N]o, they were both symmetrically
enlarged and almost touching.["]


 And then I said, "Well, you had told me that you had given him a shot
of penicillin and that you had ordered a breathing treatment." And he
said, "That's correct. I've already given him the penicillin shot."


 I said, "Well, what we normally do with our patients is to give them a
gram of Rocephin . . . and give them Dalalone . . . ."


 . . . .


 I said it probably wouldn't hurt to give him the - you know, an
additional shot of the other antibiotic, and that I said, "You needed [sic]
to observe the patient, especially after giving him the shot and the
breathing treatment."


 And he asked me how long we observed patients, and I told him that we
usually, at least with the shot, have them wait 20 minutes; and with the
breathing treatment, it could be 30 minutes to an hour.


 . . . .


 I then told him that . . . if anything changed, to call me, let me know. I
reminded him that it took me about 25 minutes to get in to the hospital.
. . . .


 And then I said, "Why don't you just give me a call after he finishes the
breathing treatment and let me know how he's doing." And that was the
end of the call. And the next call I received came later that morning
sometime before 6:00 [a.m.]

 . . . .


 Dr. Humayun said that he was going to refer the patient to me. I said
that was fine, to have the patient call me, set up an appointment that
morning.


 . . . .


 He said that - "Would it be all right if I referred the patient to you?" I
said that's - that's - that would be fine, to ask the patient to call me in
the morning to set up an appointment, to tell him - try to set that
appointment up for that - for that morning.


 In his deposition, Dr. Humayun explained his reasons for contacting Dr.
Appling, in part, as follows:

 Q: What time did you call Dr. Appling?


 A: About 3:15[a.m.].


 Q: And that would be after your examination?


 A: After the examination.


 Q: And when you finished your examination, you just weren't
comfortable about what problem Mr. Majzoub might have?


 A: Yes, I had an understanding of his problem.


 Q: But you weren't entirely sure; is that correct?


 A: You are never sure about anything.


 Q: All right. So you consulted with someone who was a specialist
in the area of your concern?


 A: That's correct.


 Q: And your number one concern was that the fact that you heard
stridor?


 A: That's correct.


 . . . .


 Q: And you knew stridor was bad, could be?


 A: Could be.


 Q: And so you wanted to call an ENT specialist; is that correct?


 A: That's correct.


 Later that morning, Majzoub stopped breathing and arrested in the emergency
room. Dr. Humayun attempted to intubate him, was unsuccessful, and then performed
an emergency tracheotomy. In the interim, Dr. Appling was called and was asked to
come to the hospital to assist Dr. Humayun. When Dr. Appling arrived, he examined
Majzoub for the first time and transferred him to the intensive care unit. A
subsequent EEG showed that Majzoub had no brain activity. Three days later,
Majzoub died.

Summary Judgment

 In her first point of error, appellant contends that the trial court erred in
granting summary judgment based on its explicit finding that, as a matter of law, Dr.
Appling owed no duty to Majzoub because no physician-patient relationship existed
between them before Majzoub suffered a cardiac arrest. (3)

 In a motion for summary judgment, the movant has the burden to demonstrate
there is no genuine issue of material fact, and that it is entitled to judgment as a matter
of law. Tex. R. Civ. P. 166a(c); See Am. Tobacco Co. Inc. v. Grinnell, 951 S.W.2d
420, 425 (Tex. 1997). In determining the existence of a material fact issue that would
negate a summary judgment, the trial court must take the evidence of the nonmovant
as true, examine every reasonable inference, and resolve all doubts in the
nonmovant's favor. Lehrer v. Zwernemann, 14 S.W.3d 775, 777 (Tex.
App.--Houston [1st Dist.] 2000, pet. denied).

 To prevail in a medical malpractice claim against a physician, a plaintiff must
prove there was (1) a duty to conform to a particular standard of care, (2) a breach of
that standard, (3) a resultant injury, and (4) a causal connection between the breach
of the standard and the injury. Wax v. Johnson, 42 S.W.3d 168, 171 (Tex. App.
--Houston [1st Dist.] 2001, pet. denied). The question of duty is a question of law,
which a court must decide before reaching the standard of care. St. John v. Pope, 901
S.W.2d 420, 423 (Tex. 1995). A physician cannot be liable for medical malpractice
unless the physician breaches a duty flowing from a physician-patient relationship. 
Wheeler v. Yettie Kersting Mem'l Hosp., 866 S.W.2d 32, 38 (Tex. App. --Houston
[1st Dist.] 1993, no writ). In considering whether a duty is owed, therefore, the trial
court must first consider whether a physician-patient relationship was established.

 A physician's duty to treat a patient with proper professional skill derives from
the consensual relationship between patient and physician. St. John, 901 S.W.2d at
423. Only when this relationship exists can a breach of duty resulting in medical
malpractice occur. Id. In St. John, the supreme court stated, "Creation of the
physician-patient relationship does not require the formalities of a contract. The fact
that a physician does not deal directly with a patient does not necessarily preclude the
existence of a physician-patient relationship." Id. at 424.

 A physician-patient relationship may be established at the express or implied
consent of the physician. Id. at 423. While consent may be implied, the "on-call"
status of a physician does not automatically impose a duty. Id. at 424. If there is no
prior relationship between the physician and the patient, there must be some
affirmative action on the part of the physician to treat the patient to create such a
relationship. Day v. Harkins & Munoz, 961 S.W.2d 278, 280 (Tex. App. --Houston
[1st Dist.] 1997, no writ). A physician does not need to have direct physical contact
with a patient in order to establish a physician-patient relationship. St. John, 901
S.W.2d at 424.

 Dr. Appling argues he gave no express or implied consent to create a
physician-patient relationship with Majzoub. He also argues that he did not take any
affirmative acts that established a physician-patient relationship with Majzoub and
that his telephone conversation with Dr. Humayun was not enough to establish such
a relationship.

 Appellant argues that, although Dr. Appling never saw, talked to, or examined
Majzoub before the anoxic brain injury, the recommendations Dr. Appling made to
Dr. Humayun on the telephone, his request to be updated on Majzoub's condition,
and his consent to try to see Majzoub in his office the following day established the
existence of a physician-patient relationship. Appellant contends that Dr. Appling
took affirmative action when he listened to Dr. Humayun's recitation of Majzoub's
symptoms and suggested treatment in the form of additional medication, and when
he requested that he be called and updated on Majzoub's status following the
completion of the breathing treatments.

 Dr. Appling relies on Lopez v. Aziz, 852 S.W.2d 303 (Tex. App.--San Antonio
1993, no writ). In Lopez, a treating physician consulted once by telephone with a
colleague, who was an OB/GYN specialist, and then followed the specialist's advice. 
Id. at 304. The Lopez court concluded that the consulted doctor "did no more than
answer the professional inquiry of a colleague. There is no evidence of any
consensual basis for the existence of a physician-patient relationship arising out of
that one telephone conversation." Id. at 306. The court held no physician-patient
relationship was created between the specialist and the patient and affirmed the trial
court's summary judgment in favor of the specialist. Id. In reaching its conclusion,
the court noted the holding of a similar Michigan case, and quoted from it as follows:

 Defendants' medical opinions were addressed directly to [the treating
physician] as a colleague, and not indirectly to plaintiffs as patients. The
opinions were not in the nature of prescribed course of treatment, but
were recommendations to be accepted or rejected by the [treating
physician] as he saw fit. In short, the telephone conversations between
[the treating physician] and defendants did not give rise to a physician
patient relationship . . . .


Id. at 306-07 (quoting Hill By Burston v. Kokosky, 463 N.E.2d 265, 267 (Mich. Ct.
App. 1990)) (emphasis added).

 Appellant points out that Lopez is distinguishable from the present case 
because Dr. Appling (1) was on-call to answer inquiries from emergency room
doctors, (2) agreed to try to see Majzoub the following day, (3) told Dr. Humayun it
would take him about 25 minutes to come to the emergency room, if needed, and (4)
asked to be updated on Majzoub's condition following the breathing treatments. 
Nevertheless, we note that because there was no prior physician-patient relationship
between Mr. Majzoub and Dr. Appling, our focus is on whether Dr. Appling took
some affirmative action to treat Majzoub. See Day, 961 S.W.2d at 280. Thus, we
find the reasoning of Lopez to be persuasive.

 In oral argument, counsel for appellant relied on Lection v. Dyll, 65 S.W.3d
696 (Tex. App.--Dallas 2001, pet. denied). In Lection, an emergency room doctor
telephoned an on-call specialist to discuss a diagnosis of a patient. Id. at 707. The
emergency room doctor telephoned the on-call specialist, "who had an obligation to
the hospital to assist, and not merely because [the on-call specialist] was a colleague." 
Id. The emergency room doctor "sought and relied upon the [on-call physician's] 
diagnosis and treatment plan." Id. The Lection court noted:

 The summary judgment record contains evidence that [the on-call
physician] diagnosed Lection's condition, told [the emergency room
physician] that no other treatment was necessary, and assured [the
emergency room physician] that it was "all right" for her to have left the
hospital. These statements constitute an evaluation of the information
provided and a medical decision concerning Lection's need for
treatment and admission to the hospital and thus are "affirmative acts"
towards Lection's treatment. (citation omitted) We conclude the
summary judgment evidence does not conclusively establish that [the
on-call physician] made no affirmative acts of treatment toward Lection.


Id. (emphasis added).


 Although Dr. Appling was consulted as an on-call physician and not merely as
a "colleague," we find that Lection is substantively distinguishable. Before Majzoub
was transferred to the ICU, Dr. Humayun retained the responsibility for his care and
was free to accept or decline the recommendations provided by Dr. Appling. Dr.
Appling did not proffer a medical diagnosis of Majzoub's condition and did not make
any medical decisions with regard to Majzoub. Nothing in the record indicates that,
at the time of their telephone conversation, either doctor contemplated that Dr.
Appling's comments were binding on Dr. Humayun or that Dr. Appling had any
responsibility to control the course of Majzoub's treatment. See Lopez, 852 S.W.2d
at 307. Based on the summary judgment record, we conclude Dr. Appling did not
take any affirmative action to treat Majzoub.

 We hold that the summary judgment evidence established as a matter of law
that there was no physician-patient relationship between Dr. Appling and Majzoub
prior to the time Majzoub was transferred to the ICU. Therefore, we hold that the
trial court did not commit error in granting Dr. Appling's motion for summary
judgment.

 We overrule appellant's point of error.

Conclusion


 Although a physician-patient relationship may be established by the implied
consent of a physician, the "on-call" status of a physician does not automatically
impose a duty. St. John, 901 S.W.2d at 424. Further, we hold that a duty is not
automatically imposed when an on-call physician consults with an emergency room
physician in regard to a patient. Nor is a duty necessarily imposed when a doctor
agrees to see a patient at a future time. Rather, as we have noted before, without the
express consent of the physician or a prior physician-patient relationship, there must
be some affirmative action on the part of the physician to treat the patient to create
such a relationship. Day, 961 S.W.2d at 280. 

 When a physician undertakes an affirmative action to treat a patient, the
physician's consent to establish a physician-patient relationship may then be implied. 
Mere recommendations, made by an on-call physician, to be accepted or rejected by
a treating physician do not constitute such an affirmative act. As noted by the
Kokosky court: 

 The extension of potential malpractice liability to doctors with whom a
treating physician has merely conferred, without more, would
unacceptably inhibit the exchange of information and expertise among
physicians. This would benefit neither those seeking medical attention
nor the medical profession. 


Kokosky, 463 N.W.2d at 268. We agree with the Lopez court that to expose
physicians to liability for simply conferring with a treating physician would be
detrimental in the long run to those seeking competent medical attention and is
contrary to the public policy of this state. See Lopez, 852 S.W.2d at 307. 

 We affirm the judgment of the trial court.



 Terry Jennings

 Justice


Panel on rehearing consists of Justices Mirabal, Hedges, and Jennings.

Publish. Tex. R. App. P. 47.4.
1. Appellant raises a conditional second point of error arguing in favor of the trial
court's decision to strike Dr. Appling's affidavit as summary judgment
evidence. Because Dr. Appling does not contest that decision by cross-point,
we need not address the issue. Tex. R. App. P. 25.1.
2. "Stridor" is defined as a high-pitched sound, caused by a blockage in the throat
or the larynx. The American Illustrated Medical Dictionary 1453 (22d
ed. 1951).
3. Appellant does not assert a claim for medical malpractice for any acts or
omissions by Dr. Appling that occurred after he arrived at the hospital.