Thao CHAU and Ha Dien Do, Individually and As Next Friend of their Minor Children, S.D. and H.D., Appellants,

v.

Jefferson RIDDLE, M.D. and Greater Houston Anesthesiology, P.A., Appellees.

No. 01–04–00551–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 28, 2006.

Rehearing Overruled Nov. 30, 2006.

Ron S. Rainey, Houston, TX, for Appellants.

Jeffrey B. McClure, Kendall M. Gray, Cameron P. Pope, Virginia A. Barry, Andrews & Kurth, L.L.P., Houston, TX, for Appellees.

Panel consists of Justices NUCHIA, KEYES, and HANKS.

## OPINION

GEORGE C. HANKS, JR., Justice.

Thao Chau and Ha Dien Do, individually and as next friend of their minor children, S.D. and H.D. (collectively referred to as "the Dos"), appeal the trial court's order granting Jefferson Riddle, M.D. and Greater Houston Anesthesiology, P.A.'s ("GHA") motion for summary judgment and dismissing the Dos' claims against them. In five issues, the Dos argue that (1) the trial court erred in striking their expert's affidavit and their second supplemental designation of expert witnesses; (2) the trial court erred in striking two paragraphs from another expert's affidavit; (3) the trial court erred in overruling their objections to the affidavits filed by two defense experts; and (4) the trial court erred in granting Riddle and GHA's motion for summary judgment and dismissing the Dos' claims. We affirm.

## Background

On October 29, 2001, Dr. Jefferson Riddle was an on-call anesthesiologist at Memorial Southwest Hospital. On this same day, Thao Chau, pregnant with twins, went into labor at Memorial Southwest and remained in labor until the morning of October 30, 2001. Ms. Chau's obstetrician, Dr. Le, decided to perform an emergency cesarean section, and Dr. Riddle was called to provide anesthesia for Ms. Chau during the surgery. After an unsuccessful attempt to use epidural anesthesia, Dr. Riddle administered general anesthesia to Ms. Chau.

At 2:46 a.m. on October 30, 2001, S.D. was delivered "floppy," without any tone and very pale. The neonatal team took over S.D.'s care, but, after failing to resuscitate him, Dr. Le asked Dr. Riddle to assist. Dr. Riddle proceeded to intubate S.D. Afterwards, Dr. Riddle, using a stethoscope, listened and reported hearing breath sounds in S.D.'s chest. He also reported seeing S.D.'s chest rise. At this time, the neonatal team proceeded with the resuscitation, and Dr. Riddle returned to Ms. Chau, who was experiencing bleeding from a uterine atony.[1]

S.D.'s endotracheal tube was secured by a nurse on the neonatal team. Two members of S.D.'s neonatal team reported hearing breath sounds in S.D.'s chest, although one other member reported not hearing breath sounds. The neonatal team started chest compressions as S.D. remained unresponsive. Dr. Ruiz–Puyana, an on-call neonatologist, arrived in the operating room approximately 13 to 15 minutes after S.D. was delivered and took over efforts to resuscitate him. Dr. Ruiz–Puyana reported not hearing breath sounds and found that the intubation tube was lodged in S.D.'s esophagus. Dr. Ruiz–Puyana extubated and re-intubated S.D., at which time his color improved, but he still did not have a heart rate. Dr. Ruiz–Puyana then administered medications and afterwards detected a heart rate. S.D. suffered permanent brain damage due to a lack of oxygen.

On July 22, 2002, the Dos brought a healthcare liability suit against Dr. Riddle alleging medical malpractice in his care of S.D. The suit also named GHA, Riddle's

1. In his affidavit, Dr. Riddle explained that a uterine atony is a potentially life-threatening condition that occurs "where there is exces- sive bleeding from the uterus due to the failure of the uterus to sufficiently contract after delivery."

employer, as being vicariously liable for the alleged negligence.[2]

The trial court granted Riddle and GHA's motion to limit expert testimony to one witness in each area of expertise. The Dos de-designated Dr. Scott Reeves and left Dr. Ronald Katz as their testifying anesthesiology expert.

Riddle and GHA moved for both traditional and no-evidence summary judgments. The motion asserted that there was no evidence that Dr. Riddle was negligent in his care of S.D. and, in the alternative, if there was a fact issue on this claim, Dr. Riddle should prevail under a traditional summary judgment because he proved his Good Samaritan affirmative defense.[3]

In response to the summary judgment motion, the Dos submitted two affidavits from Dr. Reeves, their previously de-designated expert. Dr. Reeves testified that an "on call" anesthesiologist expects emergencies, which include intubating newborns. Dr. Reeves further testified that Dr. Riddle cannot prevail on the Good Samaritan defense because he became associated with Dr. Le when Le asked him to assist in the caesarian section; therefore, Dr. Riddle became S.D.'s physician while intubating him. Also, despite what Dr. Riddle asserted in his affidavit, Dr. Reeves testified that Dr. Riddle would be entitled to remuneration for S.D.'s intubation, which would also fall outside the Good Samaritan statute. The Dos filed a second supplemental designation of expert witnesses that re-designated Dr. Reeves as an additional anesthesiology expert.

Dr. Riddle and GHA moved to strike Dr. Reeves's affidavits as well as the Dos' second supplemental designation of expert witnesses. The Dos did not respond to the motion, and it was granted. Dr. Riddle and GHA then filed a motion to strike paragraphs six and nine of Dr. Katz's affidavit for not being probative on the issue of whether Dr. Riddle was entitled to receive remuneration for his services of S.D. Again, the Dos did not respond, and the trial court granted the motion. Finally, at a hearing on the motion for summary judgment, the trial court granted summary judgment to Dr. Riddle and GHA, and the case was dismissed with prejudice.

## Expert Testimony

In issues one and two, the Dos argue that the trial court erred in striking their second amended designation of expert witnesses, Dr. Reeves's affidavits, and paragraphs six and nine of Dr. Katz's affidavit. In issues three and four, the Dos contend that the trial court erred in overruling their objections to the affidavits filed by two defense experts.

### Designation of Expert Witnesses

■ Exclusion of expert testimony is reviewed under an abuse of discretion standard. *McIntyre v. Ramirez*, 109 S.W.3d 741, 749 (Tex.2003). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *Powers v. Mem'l Hermann Hosp. Sys.*, 81 S.W.3d 463, 465 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). Under an abuse of discretion standard, a reviewing court may

---

**2.** Numerous healthcare providers were sued *in addition to* Riddle and GHA. This case has been severed from the remaining claims in the case.

**3.** The Good Samaritan statute provides an affirmative defense against ordinary negligence for persons who administer emergency care, under specified circumstances. TEX. CIV.

PRAC. & REM.CODE § 74.001 ANN. The Legislature has amended the statute, effective September 1, 2003. Acts of June 1, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 204. Because the amendments do not apply to our decision today, all statutory references are to the Code as it existed at the time that the care was rendered.

not substitute its own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002).

Unless otherwise ordered by the court, a party must designate experts within a specified time frame. *See* TEX.R. CIV. P. 195.2. A party has a duty to amend or supplement responses to discovery when the party learns that the discovery was incomplete or incorrect. *See* TEX.R. CIV. P. 193.5. Testimony not disclosed in response to discovery is permitted upon a showing of good cause or if its use would not unfairly surprise or prejudice the other party. TEX.R. CIV. P. 193.6. Exclusion of a witness for a party's failure to timely or properly designate a witness is a sanction available to the trial court. TEX.R. CIV. P. 193.6.

Here, the modified docket control order indicated that only one expert per specialty could be designated. Accordingly, the Dos designated Dr. Ronald Katz as their testifying anesthesiology expert. In their second supplemental designation of expert witnesses, the Dos re-designated Dr. Reeves without de-designating Dr. Katz. The Dos filed no response to Dr. Reeves and GHA's motion to strike; therefore, we hold that the trial court acted within its discretion when it struck Dr. Reeves as a sanction for the Dos' failure to timely or properly designate him. *See id.*

### Summary Judgment Evidence

In addition to striking their expert designation, the trial court struck Dr. Reeves's affidavits and two paragraphs in Dr. Katz's affidavit that were filed in response to Dr. Riddle's and GHA's motion for summary judgment.

■ To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was in error and that the error was calculated to cause

and probably did cause rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex. 1989). The summary judgment rule provides that summary judgment proof must contain facts that would be admissible in evidence. *United Blood Servs. v. Longoria,* 938 S.W.2d 29, 30 (Tex.1997); *see also* TEX.R. CIV. P. 166a(f). To prove facts through an interested witness, the testimony must be uncontroverted, clear, positive, direct, credible, free from contradiction, and susceptible to being readily controverted. *McIntyre,* 109 S.W.3d at 749.

### Dr. Reeves's Affidavits

■ Dr. Riddle and GHA filed an objection to and a motion to strike the Dos' summary judgment evidence. Specifically, they sought to strike Dr. Reeves's two affidavits—Exhibit A, dated September 15, 2003, and Exhibit G, dated January 15, 2003. The objection was that neither affidavit would be admissible at trial in this case. *See* TEX.R. CIV. P. 166a(f); *United Blood Servs.,* 938 S.W.2d at 30. They further objected that neither affidavit was adequate summary judgment evidence on causation. The Dos did not respond to the motion.

■ When the Dos filed their summary judgment response, Dr. Reeves was not their designated expert. The affidavit of an expert who is not properly designated may not be used as evidence in a summary judgment context. *Cunningham v. Columbia/St. David's Healthcare,* 185 S.W.3d 7, 10–11 (Tex.App.-Austin, no pet.); *Ersek v. Davis & Davis, P.C.,* 69 S.W.3d 268, 274 (Tex.App.-Austin 2002, pet. denied). Where the expert's testimony will be excluded at trial on the merits, it will be excluded from a summary judgment proceeding. *Ersek,* 69 S.W.3d at 273. The affidavits were inadmissible as summary judgment proof per rule 166a(f) [4] of the

**4.** Rule 166a(f) provides that supporting and opposing affidavits shall be made on personal

Texas Rules of Civil Procedure. Tex.R. Civ. P. 166a(f); *see also Ersek*, 69 S.W.3d at 271.

Accordingly, because Dr. Reeves was not properly designated, because we have already held that the trial court did not abuse its discretion in striking the Dos' second supplemental designation in which they re-designated Dr. Reeves, and because Dr. Reeves would be unable to testify during the trial on the merits, we hold that the trial court did not abuse its discretion in striking Dr. Reeves's affidavits filed in response to Dr. Riddle and GHA's motion for summary judgment.[5]

We overrule issue one.

**Dr. Katz's Affidavit**

■ In issue two, the Dos contend that the trial court erred in striking paragraphs six and nine of Dr. Katz's affidavit.

In seeking the protection of the Good Samaritan statute, Dr. Riddle testified that he was not entitled to receive payment for the services provided to S.D. He asserted that neither he nor anyone he was familiar with in Harris County would have been entitled to remuneration "under these circumstances." In response, the Dos offered the affidavit of Dr. Katz, a board-certified anesthesiologist from California, to support their contention that Dr. Riddle was entitled to compensation. Dr. Riddle and GHA moved to have paragraphs six and nine struck from Dr. Katz's affidavit for not being probative on the issue of whether Dr. Riddle was entitled to remuneration for the intubation of S.D. because they were conclusory and Dr. Katz was not qualified to opine about the billing practices of a Houston-based anesthesiologist.

The paragraphs that were struck stated the following:

6. Anesthesiologists are hospital-based doctors, meaning we rarely have offices where we see patients, and usually our medical practice is at a hospital. When we render anesthesia services, we expect to be compensated, whether we perform those services "on call" or during the regular workday; it is our practice to charge (or for the hospital to charge if we are salaried and at a teaching facility) for those services.

. . . .

9. From the time that Dr. Riddle began providing the anesthesia for the cesarean section in this case, he became "associated with" the attending physician, Dr. Le. He became Dr. Le's partner, associate or colleague on the Labor and Delivery team, and they had to work together for all the patients involved in the birth—the mother and the children. Both obstetrician and anesthesiologist in a C-section are treating both the mother and the child because whatever they do to the mother is also being done to and affects the child who is in that mother's body, whether by administering drugs, providing oxygen, and the like. It is their job to care for both the mother and the child/children. So it is disingenuous for an anesthesiologist during a C-section to say he had no responsibility for the child, especially under the circumstances where there was no neonatologist present, the baby was in distress, he had undertaken to intubate the child, and his adult patient (the mother) was not in crisis. It is below the standard of care for an anes-

knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Tex.R. Civ. P. 166a(f).

5. Despite filing several responses and supplemental responses to Dr. Riddle and GHA's motion for summary judgment, the Dos never argued that the trial court arbitrarily enforced its docket control order.

thesiologist providing anesthesia during a C-section to care for only the mother and not the child as well where the mother is medically stable. Caring for both is a juggling act the anesthesiologist must manage within the standards of care.

[S.D.] was and would have been Dr. Riddle's responsibility in any event, as the "on call" anesthesiologist. If the mother had delivered without C-section, and the baby was not breathing, in the absence of a neonatologist, as the "on call" anesthesiologist, Dr. Riddle would likely have been called in specifically for the baby who didn't have an established airway as the "on call" anesthesiologist.

Anesthesiologists routinely perform intubations for general anesthesia, and are often called to perform intubations or assist in difficult intubations, in an operating room or otherwise, because they are usually the most qualified to do so by experience and training. In these situations, anesthesiologists (or the hospital if they are in a teaching hospital and the anesthesiologists are salaried) commonly charge and are entitled to charge for these services. The intubation of [S.D.] is no different from the intubation of other patients in which anesthesiologists commonly charge and are entitled to charge for their services.

■■■ "The relevant standard for an expert's affidavit opposing a motion for summary judgment is whether it presents some probative evidence of the facts at issue." *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 122 (Tex.1996). A conclusory statement of an expert witness is insufficient to create a question of fact to defeat summary judgment. *McIntyre,* 109 S.W.3d at 749. A party offering an expert's affidavit must demonstrate that the witness "possesses special knowledge as to the very matter on which he proposes to give an opinion." *Gammill v. Jack*

*Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex.1998).

Paragraph six of Dr. Katz's affidavit states, in pertinent part, that, when an anesthesiologist renders anesthesia services, whether on call or during the regular workday, "it is our practice to charge for those services." The testimony in paragraph nine states that Dr. Riddle became responsible for S.D. when he assumed the care of Mrs. Chau. As such, he was entitled to compensation for intubating S.D. after birth.

While Dr. Katz purported to have personal knowledge of the facts recited in his affidavit, his statement regarding Dr. Riddle's entitlement to compensation is a legal conclusion with no supporting facts or rationale. *See McIntyre,* 109 S.W.3d at 749 (holding that Maryland doctor not qualified to testify about "what's ordinarily billed or what the law ordinarily allows people to recover for their medical services in the State of Texas"). Dr. Katz's affidavit makes no claims that, within this particular locale, an anesthesiologist acting within the circumstances of these facts would have been entitled to compensation. *See id.* A conclusory statement of an expert is insufficient to create a question of fact to defeat a summary judgment. *Id.* Consequently, this testimony is not probative of the issue at hand, and, as such, the trial court did not abuse its discretion in striking it.

We overrule issue two.

### Dr. Riddle's Affidavit

■■■ In issue three, the Dos contend that the trial court erred in overruling their objections to Dr. Riddle's affidavit offered in support of his contention that he was not entitled to remuneration for intubating S.D.

The Dos objected to paragraph six of Dr. Riddle's affidavit where he stated that

he "was only entitled to bill for and only did bill for the anesthesia services I provided to my patient, Thao Chau," and that he was "not entitled to charge for the intubation of [S.D.]" and was "only entitled to charge for the services directly related to the patient's care and treatment." The paragraphs in question stated as follows:

I was only entitled to bill for and only did bill for the anesthesia services I provided to my patient, Thao Chau. I would not ordinarily receive or ordinarily be entitled to receive remuneration under the above described circumstances for the emergency intubation of [S.D.] Neither myself nor anyone else that I am familiar with in Harris County would have charged a fee for the emergency intubation of [S.D.] or to any other person under the circumstances of this case. I did not charge for the intubation of [S.D.], I was not entitled to charge for the intubation of [S.D.], and I did not render the intubation related care to [S.D.] in expectation of compensation. This is not a situation for which I have *ever* or would *ever* charge for. As the only anesthesiologist administering anesthesia to Ms. Chau during her cesarean section, I am only entitled to charge for the services directly related to that patient's care and treatment.

In their objection to the summary judgment evidence, the Dos asserted that (1) Dr. Riddle is not an attorney and, pursuant to Texas Rule of Evidence 702, is not qualified to comment on what he is "entitled to"; (2) his statement was conclusory; (3) he cannot testify as a lay witness under rule 701 because he has not demonstrated "what rational basis leads him to that conclusion"; and (4) the statement "under the circumstances of this case" is "deceptively vague."

■ In *McIntyre*, the Texas Supreme Court held that "proof that Dr. McIntyre is not *legally entitled* to remuneration un-

der any conceivable circumstance or theory is unnecessary." *McIntyre*, 109 S.W.3d at 746 (emphasis added). A person seeking protection of the Good Samaritan statute must prove that he would neither ordinarily receive nor ordinarily be entitled to receive remuneration. *Id.* at 747. If a person presents evidence that he does not customarily receive payment under the circumstances in question, he can negate the first prong of section 74.001(d). *Id.* at 746.

Unlike Dr. Katz's legal conclusion regarding billing practices, Dr. Riddle's affidavit provides "supporting facts or rationale" for his statement that he does not ordinarily receive payment for and is not entitled to bill for S.D.'s intubation. *See id.* at 749. Furthermore, because *McIntyre* only requires that Dr. Riddle prove that he does not customarily receive payment under the circumstances in question, the Dos cannot prove that the alleged error was calculated to cause and probably did cause, rendition of an improper judgment. *See Gee*, 765 S.W.2d at 396. Finally, the Dos' complaints regarding Dr. Riddle's use of the term "under the circumstances of this case" are unfounded considering that the Good Samaritan statute uses the term "under such circumstances" and the *McIntyre* case refers to "under the circumstances in question." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(d); *McIntyre*, 109 S.W.3d at 746.

Accordingly, we overrule issue three.

**Marie Walton's Affidavit**

■ In issue four, the Dos contend that the trial court erred in overruling their objections to Marie Walton's affidavit where she testified that, as the director of operations for Preferred Healthcare Business Services—the company that provided billing services for Dr. Riddle and GHA—she knew that Dr. Riddle could only charge for the anesthesia he administered to his patient, Thao Chau.

The Dos objected to Walton's affidavit for containing "several self-serving conclusory statements ... about 'GHA's billing guidelines' and 'applicable guidelines.' However, none of those guidelines have been proved up as a business record, attached or even described, if indeed they exist." They objected to the "rank hearsay," and conclusory, self-serving affidavit. The paragraphs in question stated as follows:

> The charge for anesthesia services provided to Thao Chau on October 30, 2001 was $734.50. Dr. Riddle charged only for the anesthesia services he provided to Thao Chau on October 20, 2001.
>
> Pursuant to GHA's billing guidelines, Dr. Riddle was the primary anesthesiologist providing anesthesia services to Thao Chau and may only charge for the anesthesia services he provided to Thao Chao. [sic]
>
> Pursuant to such guidelines, Dr. Riddle did not submit a bill for the intubation of [S.D.] He would not be able to bill for the intubation of [S.D.] I am not familiar with anyone in Harris County who would send a bill for providing emergency care for [S.D.] under the circumstances of this case. An anesthesiologist would not ordinarily receive or ordinarily be entitled to receive payment under the circumstances in which the emergency care was provided to [S.D.]
>
> Pursuant to the applicable billing guidelines, Dr. Riddle would not be entitled to payment for a procedure that was not related to his patient, Thao Chau, on October 30, 2001.

The Dos complain that (1) Walton is not an attorney and therefore not qualified to comment, as an expert, on what Dr. Riddle is entitled to charge; (2) she cannot comment, as a lay witness, because she "has not demonstrated to us what rational basis leads her to that conclusion"; and (3) the term "the circumstances of this case" is "deceptively vague."

Walton testified that she has personal knowledge of the facts of this case and, as such, she can certainly testify to what Dr. Riddle's ordinary billing practices are. Furthermore, as we held above, *McIntyre* only requires that Dr. Riddle prove that he does not customarily receive payment under the circumstances in question. Thus, the Dos cannot prove that the alleged error regarding Walton's testimony regarding "entitlement" was calculated to cause, and probably did cause, rendition of an improper judgment. *See Gee*, 765 S.W.2d at 396. Finally, the Dos' complaints regarding Walton's use of the term "the circumstances of this case" are unfounded considering that the Good Samaritan statute uses the term "under such circumstances" and the *McIntyre* case refers to "under the circumstances in question." See Tex. Civ. Prac. & Rem.Code Ann. § 74.001(d); *McIntyre*, 109 S.W.3d at 746.

We overrule issue four.

### Summary Judgment

In issue five, the Dos contend that the trial court erred in granting the motion for summary judgment and dismissing their claims. Dr. Riddle and GHA's summary judgment consisted of (1) a traditional summary judgment in which they asserted that the Good Samaritan affirmative defense precluded recovery and (2) a no-evidence summary judgment in which they asserted that there was no evidence that Dr. Riddle had a duty to care for S.D., there was no evidence of a breach of the alleged duty, and there was no evidence that the breach of the alleged duty caused S.D.'s injuries.

### Good Samaritan

In a traditional summary judgment, the movant bears the burden of proof. Tex.R. Civ. P. 166a(c); *Roskey v. Tex. Health*

*Facilities Comm'n,* 639 S.W.2d 302, 303 (Tex.1982). All doubts concerning the existence of a genuine issue of fact must be resolved against the movant. *Montgomery v. Kennedy,* 669 S.W.2d 309, 311 (Tex. 1984). Once the movant proves a right to a summary judgment, the burden shifts to the nonmovant to present evidence creating genuine issues of material fact. *Phan Son Van v. Pena,* 990 S.W.2d 751, 753 (Tex.1999). A defendant moving for summary judgment on an affirmative defense has the burden to establish conclusively that defense. *McIntyre,* 109 S.W.3d at 748.

■ Under certain circumstances, the Good Samaritan statute exempts a person who responds to a medical emergency from liability for ordinary negligence. The statute provides in relevant part:

Liability for Emergency Care

(a) A person who in good faith administers emergency care ... is not liable in civil damages for an act performed during the emergency unless the act is wilfully or wantonly negligent.

(b) This section does not apply to care administered:

(1) for or in expectation of remuneration; or

(2) by a person who was at the scene of the emergency because he or a person he represents as an agent was soliciting business or seeking to perform a service for remuneration.

(c) If the scene of an emergency is in a hospital or other health care facility or means of medical transport, a person who in good faith administers emergency care is not liable in civil damages for an act performed during the emergency unless the act is wilfully or wantonly negligent, provided that this subsection does not apply to care administered:

(1) by a person who regularly administers care in a hospital emergency room unless such a person is at the scene of the emergency for reasons wholly unrelated to the person's work in administering health care; or

(2) by an admitting or attending physician of the patient or a treating physician associated by the admitting or attending physician of the patient in question.

(d) For purposes of Subsections (b)(1) and (c)(1), a person who would ordinarily receive or be entitled to receive a salary fee, or other remuneration for administering care under such circumstances to the patient in question shall be deemed to be acting for or in expectation of remuneration even if the person waives or elects not to charge or receive remuneration on the occasion in question.

(e) This section does not apply to a person whose negligent act or omission was a producing cause of the emergency for which care is being administered.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.001.

The Good Samaritan statute has separate provisions to apply depending on the physical location at which the emergency care was rendered. *See id.* § 74.001(a), (c). Here, the scene of the emergency was a labor and delivery room in a hospital. Accordingly, this case implicates section 74.001(c), which applies when the scene of the emergency is a hospital. *See id.* § 74.001(c). Dr. Riddle testified that he acted in good faith and without wilful or wanton negligence, and the Dos did not present any controverting evidence on this issue; therefore, Dr. Riddle is exempt from liability under section 74.001(c), unless he is excepted by some other provision of the statute.

## Pre-existing Relationship or Duty

▮ The purpose of the Good Samaritan statute is to protect persons who respond to an emergency absent a pre-existing relationship or duty to respond. *See McIntyre*, 109 S.W.3d at 747–48. While consent may be implied, the "on call" status of a physician does not automatically impose a duty. *St. John v. Pope*, 901 S.W.2d 420, 424 (Tex.1995).

The Dos contend that the duty of an anesthesiologist to a patient in the process of giving birth also extends to the unborn child. They offer the affidavit of Dr. Katz, which states that "it is foreseeable that an anesthesiologist may have to intubate a newborn when called to assist in a cesarean section," and that, "from time to time," an anesthesiologist is needed to intubate the newborn if he can do so because the mother is stable. In his deposition, Dr. Katz testified that, if Dr. Riddle found that he could not leave his patient to assist with the intubation, then he had no responsibility to the child. The Dos contend that Dr. Riddle owed a duty to S.D., and, as such, is precluded from seeking exemption from liability under the Good Samaritan statute.

Dr. Katz testified that Dr. Riddle could have chosen not to intubate S.D. In his affidavit, he testified that

> Dr. Riddle was [S.D.'s] treating physician while intubating [S.D.] *He could have refused to intubate him* if the anesthetized mother was in crisis or medically unstable and he had to choose her. However, once he agreed to intubate [S.D.], laid hands on him, and undertook to intubate [S.D.], Dr. Riddle became one of [S.D.'s] physicians. It was Dr. Riddle's responsibility to perform that intubation within the standard of reasonably prudent anesthesia care.

(Emphasis added.) These statements do not establish a pre-existing relationship or impart an affirmative duty on the part of Dr. Riddle to act. Rather, they seem to merely give instances when the assistance of an anesthesiologist may be sought to resolve an emergency situation and suggest that any assistance on the anesthesiologist's part is discretionary. As such, the Dos failed to establish a pre-existing relationship or an affirmative duty on the part of Dr. Riddle to act on behalf of S.D.

## Emergency

▮ The Dos contend that a lack of oxygen in a newborn may be a medical emergency, however, because the anesthesiologist can expect that this might happen and is trained to handle such a situation, then it is not a medical emergency for the purposes of the Good Samaritan statute. Just because an anesthesiologist has trained to respond to such emergencies does not make them any less of an emergency.

The Good Samaritan statute serves to shield from liability a person who acts without a pre-existing duty. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.001; *see also McIntyre*, 109 S.W.3d at 747. Even Dr. Katz acknowledged that a "patient who is not getting oxygen, or is getting little oxygen, is always an emergency." Having already held that Dr. Riddle did not have a pre-existing relationship with S.D., we hold that S.D.'s status at birth created an emergency for Dr. Riddle within the Good Samaritan statute.

## Expectation of Remuneration

▮ The protection of the Good Samaritan statute is only available if the one rendering emergency care proves that he would not ordinarily receive or ordinarily be entitled to receive remuneration for such care. *McIntyre*, 109 S.W.3d at 747. The Dos asserted that Dr. Riddle was entitled to remuneration for S.D.'s intubation.

In his affidavit, Dr. Riddle stated the following:

I am not a physician who regularly administers care in the emergency room at Memorial Southwest Hospital or any other hospital. I was not an attending or admitting physician of Thao Chau. I was not an attending or admitting physician of [S.D.]. I was not a treating physician associated with Dr. Le.... I was not a treating physician associated with Dr. Ruiz–Puyana.

I was only entitled to bill for and only did bill for the anesthesia services I provided to my patient, Thao Chau. I would not ordinarily receive or ordinarily be entitled to receive remuneration under the above described circumstances for the emergency intubation of [S.D.]. Neither myself nor anyone else that I am familiar with in Harris County would have charged a fee for the emergency intubation of [S.D.] or to any other person under the circumstances of this case. I did not charge for the intubation of [S.D.], I was not entitled to charge for the intubation of [S.D.], and I did not render the intubation related care to [S.D.] in expectation of compensation. This is not a situation for which I have ever or would ever charge for.

To prove facts through an interested witness, the testimony must be uncontroverted, clear, positive, direct, credible, free from contradiction, and susceptible to being readily controverted. TEX.R. CIV. P. 166a(c); *McIntyre*, 109 S.W.3d at 749. The Dos objected to Dr. Riddle's affidavit. The trial court, however, allowed the affidavit as well as the affidavit of billing specialist, Marie Walton, offered in support of Riddle's proposition that he was not entitled to remuneration. Having already held that the trial court did not abuse its discretion in striking the Dos' summary judgment evidence on this issue, we hold that Dr. Riddle's summary judgment evidence conclusively established that he did not act for or in expectation of remuneration within the meaning of section 74.001(b)(1) and (d) of the Texas Civil Practice and Remedies Code.

## Association

The Good Samaritan statute does not shield a treating physician associated by the admitting or attending physician of the patient in question from ordinary negligence during emergency care rendered to that patient in a hospital. TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(c)(2). The Dos claim that, because Dr. Riddle was working with Dr. Le, Ms. Chau's obstetrician, he became "associated" within the meaning of section 74.001(c)(2) of the Good Samaritan statute. The patient in question is S.D. Dr. Le testified that he was the attending physician for Ms. Chau, but Dr. Ruiz–Puyana, the neonatologist, was the attending physician for S.D. Dr. Katz's affidavit makes no contention that Dr. Riddle was, in any way, associated with Dr. Ruiz–Puyana. As such, we hold that Dr. Riddle was not associated with S.D.'s attending physician within the meaning of the Good Samaritan statute.

We hold that Dr. Riddle and GHA conclusively established that Dr. Riddle is not excepted by any provision of the statute and is therefore entitled to the Good Samaritan affirmative defense. Having held that Dr. Riddle and GHA conclusively established their Good Samaritan affirmative defense, we need not evaluate their traditional and no-evidence summary judgment motions on negligence.

We overrule issue five.

## Conclusion

We affirm the order of the trial court granting summary judgment and dismissing the Dos' claims.

Justice KEYES, dissenting.

EVELYN V. KEYES, Justice, dissenting.

The majority opinion breathtakingly expands the scope of the Good Samaritan affirmative defense. Because the majority's construction of the statute is important to the jurisprudence of this State and is, I believe, contrary to controlling law, I respectfully dissent. I would reverse and remand this case for trial on the merits.

## Background Facts

This is an appeal from a summary judgment entered in favor of appellees Jefferson Riddle, M.D. and Greater Houston Anesthesiology, P.A. (collectively, GHA) and against appellants Thao Chau and Ha Dien Do, individually and as next friend of their minor children, S.D. and H.D. (collectively, the Dos). Dr. Riddle, whose actions are the subject of appellants' underlying malpractice suit, was on call for emergency anesthesiology services at Memorial Hermann Southwest Hospital when appellant Thao Chau was admitted for an emergency caesarian section. Dr. Riddle responded to the emergency and was associated with the delivery team assembled by the obstetrician, Dr. Le, to provide anesthesiology services for the delivery and immediate post-delivery care. S.D., one of Thao Chau's twins delivered by Dr. Le, was born floppy and did not begin breathing. Dr. Le asked Dr. Riddle to intubate him. Having determined that he could safely leave the mother, Dr. Riddle consented and intubated S.D. Dr. Riddle testified by affidavit that he used a stethoscope to listen to S.D.'s chest and determined that air was traveling to the baby's lungs before returning to the mother. He did not

secure the breathing tube and then listen again to be sure it was in the right place, actions which the Dos' expert, Dr. Katz, testified are standard practice and would have taken a few seconds. Nor did Dr. Riddle check S.D.'s end-tidal carbon dioxide to be sure that S.D. was properly intubated. Instead, he handed S.D. off to the neo-natal team of residents and nurses, who listened for breathing sounds, performed CPR, and administered epinephrine. Twelve minutes later, the on-call neonatologist, Dr. Ruiz–Puyana, arrived in the delivery room, received S.D., and determined that he had been intubated into the esophagus. She reintubated S.D., and he began to breathe. S.D. suffered severe permanent brain damage due to lack of oxygen.

Months after the deadline in the trial court's docket control order for designating experts, filing new pleadings, and filing dispositive motions, GHA filed new pleadings asserting the Good Samaritan affirmative defense, together with a motion for summary judgment on that defense. The Good Samaritan defense invoked by GHA, which has since been superseded, was then set out at section 74.001 of the Texas Civil Practice and Remedies Code.[1] At GHA's request, the trial court enforced its docket control order and a prior order limiting the Dos' experts. The court prohibited the Dos from designating an additional expert on the Good Samaritan defense and struck summary judgment evidence critical to that defense on the grounds that it was untimely filed and conclusory. The court did not enforce the docket control order against GHA. It sustained GHA's objec-

---

1. *See* Act of June 19, 1993, 73d Leg., R.S., ch. 960, 1993 Tex. Gen. Laws 4193, 4194, *amended by* Act of June 18, 1999, 76th Leg., R.S., ch. 679, § 2, sec. 74.001(a), 1999 Tex. Gen. Laws 3250, 3251 ("Former TEX. CIV. PRAC. & REM.CODE ANN. § 74.001"). A substantially rewritten version of the statute took effect on September 1, 2003, and, as amended, is now codified at section 74.151 of the Code. *See* Act of June 11, 2003, 78th Leg., R.S., ch. 204, § 10.01, sec. 74.151, 2003 Tex. Gen. Laws 847, 871 (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 74.151 (Vernon 2005)).

tions to the Dos' summary judgment proofs and overruled the Dos' objections to GHA's summary judgment proofs. Following a hearing, the trial court granted summary judgment to GHA and dismissed the Dos' claims with prejudice. The majority affirms. I dissent.

## Standard of Proof of Summary Judgment

GHA filed a no-evidence and traditional summary judgment motion on the Dos' negligence claims and a traditional summary judgment on its Good Samaritan affirmative defense. *See* Tex.R. Civ. P. 166a(b), (i).

Because a no-evidence motion for summary judgment places the burden on the non-movant to present enough evidence to be entitled to a trial, a party moving for summary judgment on an affirmative defense cannot bring a no-evidence motion for summary judgment on that defense. *Quanaim v. Frasco Rest. & Catering,* 17 S.W.3d 30, 43 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). Rather, a defendant moving for summary judgment on an affirmative defense must conclusively prove all elements of that defense as a matter of law. *American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997); *Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex.1984); *Quanaim,* 17 S.W.3d at 43. In reviewing a traditional motion for summary judgment, the reviewing court must take all evidence favorable to the non-movant as true and make all reasonable inferences in favor of the non-movant. *KPMG Peat Marwick v. Harrison County Housing Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999); *Montgomery,* 669 S.W.2d at 311; *Quanaim,* 17 S.W.3d at 41. If the movant's motion and summary judgment proof establish its right to summary judgment as a matter of law, the burden shifts to the non-movant to establish a genuine issue of material fact. *Quanaim,* 17 S.W.3d at 41–42. The existence of a legal duty is a question of law for the court to decide based on the surrounding facts. *See id.* at 43.

## GHA's Motion for Summary Judgment

In their fifth issue, the Dos contend the trial court erred in entering summary judgment in favor of GHA on its Good Samaritan defense and dismissing their claims. I agree.

## Former Section 74.001 of the Civil Practice and Remedies Code

Former section 74.001 of the Texas Civil Practice and Remedies Code, under which GHA brought its motion for summary judgment, provided, in relevant part:

(a) A person who in good faith administers emergency care ... at the scene of an emergency but not in a hospital ... is not liable in civil damages for an act performed during the emergency unless the act is wilfully or wantonly negligent.

(b) This section does not apply to care administered:

(1) for or in expectation of remuneration; or

. . . .

(c) If the scene of an emergency is in a hospital ... a person who in good faith administers emergency care is not liable in civil damages for an act performed during the emergency unless the act is willfully or wantonly negligent, provided that this subsection does not apply to care administered:

(1) by a person who regularly administers care in a hospital emergency room unless such person is at the scene of the emergency for reasons wholly unrelated to the person's work in administering health care; or

(2) by an admitting or attending physician of the patient or a treating

physician associated by the admitting or attending physician of the patient in question.

(d) For purposes of subsections (b)(1) and (c)(1), a person who would ordinarily receive or be entitled to receive a salary, fee, or other remuneration for administering care under such circumstances to the patient in question shall be deemed to be acting for or in expectation of remuneration even if the person waives or elects not to charge or to receive remuneration on the occasion in question.

Former TEX. CIV. PRAC. & REM.CODE ANN. § 74.001.

Because it is undisputed that the scene of S.D.'s emergency intubation was a hospital, former section 74.001(c) governs this case. To prove its Good Samaritan defense under section 74.001(c), GHA had to establish as a matter of law that Dr. Riddle administered care to S.D. in good faith in an emergency and was not wantonly or wilfully negligent and that he was not excluded from the protection of the Good Samaritan statute by former subsection 74.001(c)(1) or (c)(2).

The parties do not dispute that Dr. Riddle's actions with respect to S.D. were undertaken in an emergency and that they were not wantonly or wilfully negligent. However, in order to prove that Dr. Riddle was not excluded from the protection of the Good Samaritan statute by former subsection 74.001(c)(1) or (2), GHA also had to establish as a matter of law (1) that Dr. Riddle was not a person who regularly administers care in an emergency room,

or, if he was such a person, that he was at the scene of S.D.'s intubation for reasons "wholly unrelated to [his] work in administering health care," and thus was not excluded from the protection of the Good Samaritan statute by former subsection 74.001(c)(1) and (2) that Dr. Riddle was not "a treating physician associated by the admitting or attending physician" for S.D. and thus was not excluded from the protection of the Good Samaritan statute by former subsection 74.001(c)(2). If GHA established as a matter of law that Dr. Riddle was entitled to the protection of section 74.001(c) because he was at the scene for reasons wholly unrelated to his work in administering emergency anesthesiology services, satisfying subsection 74.001(c)(1), GHA would also have to prove (3) that Dr. Riddle was not legally entitled to payment for his emergency services to S.D., *i.e.,* he would not "ordinarily receive or be entitled to receive a salary, fee, or other remuneration for administering care under such circumstances," so that he was not excluded from the protection of the Good Samaritan statute by former subsection 74.001(d), which applied when a physician contended he was not excluded by former subsection 74.001(c)(1). *See* Former TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(c)(1) and (d).

I would hold that GHA failed to prove as a matter of law that Dr. Riddle was not excluded from the protection of the former Good Samaritan statute. Rather, the summary judgment evidence raises substantial fact issues as to whether he was excluded by former section 74.001(c)'s exclusionary provisions.[2] Therefore, GHA did not

---

**2.** Because the Dos did not file a cross-motion for summary judgment, I do not consider whether Dr. Riddle was barred as a matter of law from asserting the Good Samaritan affirmative defense. *See* TEX.R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); *CU Lloyd's of Texas v. Feldman,* 977 S.W.2d 568, 569 (Tex.1998) (before court of appeals may reverse summary judgment for one party and render judgment for other party, both parties must ordinarily have sought final judgment relief in cross-motions for summary judgment).

prove its entitlement to summary judgment.

### (1) Dr. Riddle's exclusion from protection by former subsection 74.001(c)(1)

Dr. Katz, the Dos' expert, testified by affidavit: [3]

7. When an anesthesiologist is "on call," in our field of anesthesiology the custom and practice is that the anesthesiologist "on call" expects and anticipates that there will be emergencies. This is something he is trained for when he is a resident in anesthesia. He (or she) knows he is there to respond to emergencies requiring his skill and expertise, and this a part of his routine and the reason he is needed in a hospital. By virtue of being "on call," an anesthesiologist is agreeing and expecting to be responding to emergencies and procedures which are performed without much advance notice. Indeed, *being "on call," the anesthesiologist assumes the duty to provide anesthesia services on an emergency basis to patients of the hospital.* This duty arises out of hospital protocols, his hospital privileges to practice anesthesiology and provide coverage, his group's agreement with the hospital, his agreement to be "on call," and professional standards of care.

*Anesthesiologists who are hospital-based such as Dr. Riddle, who work in the operating rooms and Labor and Delivery Rooms, and who are "on call," essentially specialize in responding to emergencies.* An anesthesiologist who is "on call" may be expected by the hospital to perform services as complex and long as those for general anesthesia during an operation, a cesarean section, or as simple and short as the intubation of a patient, including newborns.

*Anesthesiologists routinely respond to emergencies in a hospital because of our extensive experience and training in resuscitation.* This is part of our job and one of the reasons why we are needed at the hospital to care for its patients. We have more training and experience in intubating patients and can usually do so more quickly than other physicians or health care providers during an emergency. A patient who is not getting oxygen, or is getting little oxygen, is always an emergency.

(Emphasis added.)

Since Dr. Riddle was on call for emergency anesthesiology services and was associated with the labor and delivery team to render anesthesiology services to Thao Chau and her twins during the labor and delivery, it is logically impossible for GHA to prove as a matter of law that Dr. Riddle was in the hospital for reasons "wholly unrelated to [his] work" as an on-call anesthesiologist when he intubated S.D. and, thus, that he was not excluded from the protection of the Good Samaritan statute by former subsection 74.001(c)(1). Rather, all the evidence was to the contrary, *i.e.,* that he *was* excluded from protection as a Good Samaritan by subsection 74.001(c)(1). Notably, *the panel does not even address this issue,* even though GHA had to prove all elements of the Good Samaritan statute to establish its entitlement to summary judgment.

### (2) Dr. Riddle's exclusion from protection by former subsection 74.001(c)(2)

Likewise, it would seem to be impossible for GHA to prove as a matter of law that Dr. Riddle was not excluded from the protection of the Good Samaritan statute by former subsection 74.001(c)(2). That is, it

---

**3.** Although the trial court struck paragraphs 6 and 9 of Dr. Katz's affidavit, discussed below, it did not strike Dr. Katz as an expert or the other portions of his affidavit quoted herein.

would seem to be impossible for GHA to prove, under the circumstances of this case, (1) that Dr. Riddle was not a treating physician when he intubated S.D. and (2) that Dr. Riddle was not associated with the labor and delivery team charged with S.D.'s delivery and immediate post-delivery care assembled by Dr. Le. The majority, however, disagrees.

The majority ignores the pertinent parts of the affidavit of Dr. Katz—the *non-movants'* expert—in which Dr. Katz testifies exactly how, when, and why Dr. Riddle was associated with S.D.'s care, established a physician/patient relationship with S.D. as S.D.'s treating physician, and committed malpractice. Dr. Katz testified by affidavit:

> 8. It is foreseeable that *an anesthesiologist may have to intubate a newborn when called to assist in a cesarian section such as the one in this case.* This is because it happens on an anesthesiologist's watch from time to time *where there is no neonatologist,* where he/she has not yet arrived, or even where the neonatologist is present but requests assistance. *By virtue of the fact that a child is about to be delivered, when a neonatologist is not present, the anesthesiologist knows that as a part of the labor and delivery team, he may be sharing the care and responsibility of the mother and child (or children) being delivered.*
>
> .... Generally, the decision for an emergency cesarean involves the OB–GYN's concern that the baby is in distress and not receiving enough oxygen. *By training and experience, an anesthesiologist has more expertise in ventilating and intubating.* He routinely performs intubations for general anesthesia and is often called to perform intubation or assist in difficult intubations, in an operating room or otherwise, because he is usually the most qualified to do so. *Where a neonatologist is not present in*

*the Labor and Delivery Room* or the neonatologist is having difficulty with intubation, from time to time *an anesthesiologist is needed to intubate the newborn if he can do so because the mother is stable.* In fact, he can expect that on occasion, he will be needed to do this.

> . . . .
>
> 10. *In my opinion, Jefferson Riddle, M.D. failed to follow the above standards of reasonable, prudent and accepted care for an anesthesiologist in performing medical services for Thao Chau and [S.D.],* in at least the following acts or omissions:
>
> 1. *Dr. Riddle was [S.D.]'s treating physician while intubating [S.D.].* He could have refused to intubate him if the anesthetized mother was in crisis or medically unstable and he had to choose her. However, once he agreed to intubate [S.D.], laid hands on him, and undertook to intubate [S.D.], Dr. Riddle became one of [S.D.]'s physicians. It was Dr. Riddle's responsibility to perform that intubation within the standard of reasonably prudent anesthesia care.
>
> 2. Specifically, *the standard of care required him to intubate properly—into the trachea*—check for breath sounds with a stethoscope to determine that he was properly intubated into the trachea and not the esophagus, *secure the endotracheal tube, check end-tidal $CO_2$ to ensure that the tube was in the trachea and check again for breath sounds. These tasks only require a few seconds* of an anesthesiologist, who is already skilled and experienced at this procedure and must do this before leaving the patient.

11. *In this case, Dr. Riddle breached the standards of reasonably prudent and acceptable anesthesia care and did not properly perform the above which was below the standard of care.* Specifically, he did not secure the tube after intubation, then ensure that [S.D.] was properly intubated by listening for breath sound *again,* after he had secured the tube, to make sure it was still in the right place. He also did not check the end-tidal CO2 to ensure the infant was properly intubated.

*In fact, Dr. Riddle intubating [S.D.] without securing the tube and ensuring it was in the right place likely caused more serious risk to [S.D.] than if he had declined to do so at all, claiming he could not leave the mother. As an anesthesiologist, he is considered to be more skilled at intubation.* It is highly likely that those who weren't anesthesiologists, especially the residents with limited experience, assumed that if he did it, it must have been done correctly, and were much less likely to question whether the baby's difficulties were whether they had a good airway. As a result, [S.D.] wasn't reintubated until the neonatologist arrived several minutes later and did so. This contributed to the baby's hypoxia and brain damage.

(Emphasis added.) The majority ignores this expert testimony directly on point, even though we are required to review the *non-movant's* evidence—not the movant's—in the most favorable light and to draw all reasonable conclusions in the non-movant's favor. *KPMG Peat Marwick,* 988 S.W.2d at 748.

The majority also errs by affirming the trial court's order striking paragraph 9 of Dr. Katz's affidavit on the irrelevant ground that one subsection of the paragraph is "not . . . probative on the issue of whether Dr. Riddle was entitled to remuneration for the intubation of S.D." The expert testimony in this paragraph is high-

ly probative on the issue of whether Dr. Riddle was "a treating physician associated by the admitting or attending physician" for S.D. and was thus excluded from the protection of the Good Samaritan affirmative defense by former subsection 74.001(c)(2). Dr. Katz testified in the relevant part of paragraph 9:

9. *From the time that Dr. Riddle began providing the anesthesia for the cesarean section in this case, he became "associated with" the attending physician, Dr. Le.* He became Dr. Le's partner, associate or colleague of the Labor and Delivery team, and they had to work together for all the patients involved in the birth—the mother and the children. *Both obstetrician and anesthesiologist in a C-section are treating both the mother and the child because whatever they do to the mother is also being done to and affects the child who is in that mother's body, whether by administering drugs, providing oxygen, and the like. It is their job to care for both the mother and the child/children. So it is disingenuous for an anesthesiologist during a C-section to say he had no responsibility for the child,* especially under the circumstances where there was no neonatologist present, the baby was in distress, he had undertaken to intubate the child, and his adult patient (the mother) was not in crisis. *It is below the standard of care for an anesthesiologist providing anesthesia during a C-section to care for only the mother and not the child as well where the mother is medically stable.* Caring for both is a juggling act the anesthesiologist must manage within the standards of care.

*[S.D.] was and would have been Dr. Riddle's responsibility in any event, as the "on call" anesthesiologist.* If the mother had delivered without C-section, and the baby was not breathing, in the

absence of a neonatologist, as the "on call" anesthesiologist, Dr. Riddle would likely have been called in specifically for the baby who didn't have an established airway as the "on call" anesthesiologist. (Emphasis added).

Dr. Katz's affidavit—with or without paragraph 9—is more than sufficient to raise a fact issue as to whether Dr. Riddle was excluded from the protection of the Good Samaritan statute as the anesthesiologist associated with the labor and delivery team by the attending physician for the mother and children during the labor and delivery, Dr. Le, and as S.D.'s treating physician for the delivery of emergency anesthesiology services, including intubation.

Nor can the majority find support for its legal conclusion in the law. It cites *no* law in support of its conclusion that Dr. Riddle was not S.D.'s treating physician for the intubation, and it ignores well-established Texas law to the contrary. Under that law, a physician cannot be liable for malpractice unless he breaches a duty flowing from the physician-patient relationship. *St. John v. Pope*, 901 S.W.2d 420, 423 (Tex.1995); *Majzoub v. Appling*, 95 S.W.3d 432, 436 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). The question of duty is a question of law that must be decided in a medical malpractice case before the issue of the standard of care arises. *St. John*, 901 S.W.2d at 424; *Gross v. Burt*, 149 S.W.3d 213, 221 (Tex. App.-Fort Worth 2004, pet. denied); *Majzoub*, 95 S.W.3d at 436. The duty to treat a patient with proper professional skill arises from the consensual relationship between the physician and the patient. *St. John*, 901 S.W.2d at 423; *Majzoub*, 95 S.W.3d at 436. No formalities of contract are required. *St. John*, 901 S.W.2d at 424. While consent to the physician-patient relationship may be implied, the "on-call" status of a physician

does not automatically impose a duty. *Majzoub*, 95 S.W.3d at 436. Rather, if there has been no prior relationship between the physician and the patient, the physician must take some affirmative action to treat the patient to create such a relationship. *Id.; Lection v. Dyll*, 65 S.W.3d 696, 705 (Tex.App.-Dallas 2001, pet. denied) ("[O]n-call physician may assume a duty to the patient if he takes some affirmative action to treat the patient."). Similarly, a physician's mere presence in the labor and delivery unit of a hospital is inadequate to establish a physician-patient relationship unless the physician takes some affirmative step towards advancing the relationship. *Reynosa v. Huff*, 21 S.W.3d 510, 513 (Tex.App.-San Antonio 2000, no pet.).

A physician may decline treatment and thereby decline to create a physician-patient relationship, but once the physician agrees to examine or treat the patient, the relationship arises. *St. John*, 901 S.W.2d at 424; *Gross*, 149 S.W.3d at 221–22; *Majzoub*, 95 S.W.3d at 436. "Treatment" is defined as "the action or manner of treating a patient medically or surgically." *Lection*, 65 S.W.3d at 705 n. 5. Once the physician-patient relationship is established, the physician owes the patient a duty to treat him with the skills of a trained, competent professional, and a breach of that duty may give rise to a malpractice action. *Gross*, 149 S.W.3d at 222.

Dr. Riddle was asked by Dr. Le, the head of the labor and delivery team, to intubate S.D. He could have refused to do so had he determined that it was unsafe to leave his primary patient, the mother, Thao Chau. *St. John*, 901 S.W.2d at 424; *Gross*, 149 S.W.3d at 221–22; *Majzoub*, 95 S.W.3d at 436. However, having determined that he could safely leave the mother, Dr. Riddle consented to treat S.D. and

became S.D.'s treating physician for the intubation, contrary to the majority's conclusion. *See St. John,* 901 S.W.2d at 424; *Gross,* 149 S.W.3d at 221–22; *Majzoub,* 95 S.W.3d at 436.

The majority, likewise, cites *no* law in support of its conclusion that Dr. Riddle was not associated with the labor and delivery team, and therefore with S.D.'s care, by the admitting or attending physician, Dr. Le, for his delivery and immediate post-delivery care. Rather, the majority states that

> Dr. Le testified that he was the attending physician for Ms. Chau, but Dr. Ruiz–Puyana, the neonatologist, was the attending physician for S.D. Dr. Katz's affidavit makes no contention that Dr. Riddle was, in any way, associated with Dr. Ruiz–Puyana. As such, we hold that Dr. Riddle was not associated with S.D.'s attending physician within the meaning of the Good Samaritan statute.

The majority overlooks the material fact that Dr. Le was the head of the labor and delivery team and that he associated Dr. Riddle with the team as anesthesiologist before the delivery. It also overlooks the material facts that Dr. Ruiz–Puyana was an on-call physician, exactly like Dr. Riddle, and that she did not arrive to take over S.D.'s care until twelve minutes *after* Dr. Riddle intubated S.D. Thus, it is Dr. Ruiz–Puyana—not Dr. Riddle—who, under Texas law, might be able to argue that she had no physician/patient relationship with S.D. at the time of the intubation. *See Majzoub,* 95 S.W.3d at 436; *Lection,* 65 S.W.3d at 705.

Under any reasonable interpretation of the law and the facts, GHA failed to establish as a matter of law that Dr. Riddle was not excluded from the protection of the Good Samaritan statute by either former subsection 74.001(c)(1) or former subsection 74.001(c)(2). Rather, there is substantial evidence that he was excluded from the statute's protection. Because there is a material fact issue as to whether Dr. Riddle was excluded from the protection of the Good Samaritan Statute, I would hold that GHA's motion for summary judgment fails. *See Quanaim,* 17 S.W.3d at 41–42. Consequently, unlike the majority, I would not find it necessary to determine whether GHA satisfied former section 74.001(d) of the Code by establishing as a matter of law that Dr. Riddle "would ordinarily receive or be entitled to receive … remuneration for the professional services he rendered to S.D." when offering his services to S.D. "for reasons wholly unrelated to [his] work in administering health care" in accordance with subsections 74.001(c)(1) and (d). *See* Former TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(c)(1), (d).

I would sustain the Dos' sixth issue.

### The Trial Court's Order Striking Dr. Reeves and his Expert Affidavits

The majority also errs in its holding, in response to the Dos' first issue, that the trial court did not err in striking the Dos' expert on the Good Samaritan defense, Dr. Reeves, and his affidavits, under a docket control order whose deadline for designating experts expired on April 21, 2003,[4] four months *before* GHA asserted its Good Samaritan defense and simultaneously moved for summary judgment—in pleadings untimely filed two months *after* the June 20, 2003 deadline in the *same docket control*

---

4. GHA also sought and obtained an order on June 20, 2003, limiting the Dos to one expert on malpractice. It was this order that required Dr. Reeves to be de-designated as the Dos' second expert on malpractice. The order was, of course, silent as to the Dos' right to name an expert on the Good Samaritan affirmative defense because no such affirmative defense had been asserted when the order was obtained.

*order* for filing new pleadings, filing dispositive motions, and challenging experts. Thus, GHA invoked the docket control order against the Dos at the same time it was blatantly violating the same order.

The Dos timely filed a response to GHA's surprise August 29 motion for summary judgment on its simultaneously asserted affirmative defense, attaching the two affidavits from Dr. Reeves, one responding to the Good Samaritan defense and one supporting the Dos' malpractice allegations. On the afternoon of October 2, *the day before the summary judgment hearing,* GHA filed its objections to the Dos' summary judgment evidence and a motion to strike that evidence—18 days after the evidence had been filed and a half-day before the scheduled hearing. GHA objected to both of Dr. Reeves' affidavits on the ground that Dr. Reeves was not properly designated as an expert and, therefore, his affidavits could not be used in a summary judgment context. It also argued that neither of Dr. Reeves' affidavits showed causation because neither "provides any explanation of how Dr. Riddle's conduct resulted in harm to S.D. or Plaintiffs." GHA made similar objections to Dr. Katz's affidavits.

The trial court began the hearing as scheduled the next day, October 3. At the hearing, the Dos moved for a continuance on the ground that GHA had interjected a great deal of new material into its reply to their summary judgment response and that it had also objected to their summary judgment evidence only the day before. The Dos sought additional time to respond to GHA's pleadings, which they contended were more in the nature of a new summary judgment motion than a reply, citing surprise and their inability to respond to lengthy pleadings filed on the afternoon before the hearing, including their inability even to contact their experts in the time available to respond to GHA's new pleadings. The Dos cited Texas Rule of Civil Procedure 166a(c), which they contended entitled them to 21 days notice of new summary judgment pleadings, and Rule 1, which provides that "[t]he proper objective of rules of civil procedure is to obtain a just, fair, equitable and impartial adjudication of the rights of litigants under established principles of substantive law." *See* Tex.R. Civ. P. 1, 166a(c); *see also State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991) (discouraging gamesmanship).

The trial court continued the hearing until October 17 and ordered the Dos to supplement their pleadings on or before October 10. On that date, the Dos filed their second supplemental response and second supplemental designation of experts, redesignating Dr. Reeves to testify on reasonable and necessary medical treatment and the duties of physicians in response to GHA's complaint that Dr. Reeves had been improperly designated as a summary judgment witness. On October 14, three days before the continued hearing resumed, GHA filed a motion to strike the Dos' second supplemental designation of experts. GHA's sole argument this time was that the Dos' designation of Dr. Reeves was untimely under the docket control order setting April 21, 2003 as the final date for the plaintiffs' designation of experts and its order setting July 11, 2003 as the final date for choosing one physician to testify on malpractice. In other words, GHA simply untimely recast its prior objections that Dr. Reeves was not properly designated as an expert witness under the trial court's docket control order and under its order limiting the Dos' experts. GHA again requested that Dr. Reeves and his affidavits be struck.

The hearing went forward as scheduled three days later, on October 17. By order entered October 22, the trial court granted GHA's motion for summary judgment and

its motions to strike Dr. Reeves as an expert witness and Dr. Reeves' affidavits and portions of Dr. Katz's affidavit as summary judgment evidence. The court dismissed the Dos' claims with prejudice.

The majority erroneously states that the Dos did not respond to GHA's motion to strike Dr. Reeves' affidavits and to strike the Dos' second supplemental designation of expert witnesses and thus the trial court did not err in striking Dr. Reeves and his affidavits. Not only are the majority's statements incompatible with the record, but the Dos' counsel expressly informed the panel at oral argument, upon questioning by the panel, that the Dos' responses to GHA's motions to strike Dr. Reeves and his affidavits were in the Dos' response to GHA's reply to the Dos' response to GHA's motion for summary judgment. This statement is borne out by a review of the record. Thus, the majority's affirmance of the trial court's sanctions order is based on an incorrect reading of the record. The factual support the majority finds for the trial court's actions is simply not there. Nor can the trial court's sanctions motion be justified on the basis of law.

Texas Rule of Civil Procedure 63 provides that "[p]arties may amend their pleadings, respond to pleadings on file of other parties, ... and file such other pleas as they may desire by filing such pleas with the clerk *at such time as not to operate as a surprise to the opposite party.*" TEX.R. CIV. P. 63 (emphasis added). The rule further provides that pleadings, pleas, *and responses* filed within *seven* days of trial "shall be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party." *Id.* A summary judgment proceeding is a "trial" within the meaning of this rule. *Fletcher v. Edwards*, 26 S.W.3d 66, 74 (Tex.App.-

Waco 2000, pet. denied); *see also Sosa v. Cent. Power & Light*, 909 S.W.2d 893, 895 (Tex.1995) (per curiam) (holding that Rule 63 applies to pleadings filed within seven days of summary judgment proceedings). Here there was no showing that the Dos were not surprised by GHA's untimely objection to their expert and expert affidavits or that they failed to bring their concerns to the attention of the trial court. The record reveals quite the contrary.

Notably, GHA did not couch its motion to strike Dr. Reeves and his affidavits as a motion for the exclusion of testimony from an untimely designated expert under Texas Rule of Civil Procedure 193.6. *See* TEX.R. CIV. P. 193.6. Had it done so, the Dos would have had the opportunity to establish good cause for their late designation of Dr. Reeves. *See Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914–15 (Tex. 1992) (discussing good cause to admit testimony not timely identified when Rule 215 discovery sanctions are sought and opining, "The good cause exception permits a trial court to excuse a failure to comply with discovery in difficult or impossible circumstances"); *Cunningham v. Columbia/St. David's Healthcare Sys., L.P.*, 185 S.W.3d 7, 11 (Tex.App.-Austin 2005, no pet.) (testimony from untimely designated expert will be excluded "unless the trial court determines that the party seeking to introduce the evidence established either (1) the existence of good cause for its failure or (2) that it would not unfairly surprise or prejudice the other parties to admit the evidence").

GHA merely sought enforcement of the docket control order against the Dos. Enforcement of a docket control order is reviewed under an abuse of discretion standard. *Clanton v. Clark*, 639 S.W.2d 929, 931 (Tex.1982); *G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co.*, 177 S.W.3d 537, 544 (Tex.App.-Dallas 2005, no pet.). Ex-

clusion of expert testimony is, likewise, reviewed under an abuse of discretion standard. *McIntyre v. Ramirez,* 109 S.W.3d 741, 749 (Tex.2003). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *Powers v. Mem'l Hermann Hosp. Sys.,* 81 S.W.3d 463, 465 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

The trial court plainly was not following any rule of civil procedure, specifically including Rule 193.6, its own docket control order, or any other guidelines when it arbitrarily and capriciously accepted GHA's invitation to enforce its April 21 deadline for the Dos' designation of experts and its June 20 order limiting them to one expert physician while *not* enforcing the provisions in the same order forbidding GHA from supplementing its pleadings after June 20, filing a motion for summary judgment after June 20, and challenging expert witnesses after June 20. Rather, without any justification at all, the court deprived the Dos of any opportunity to conduct discovery, name experts, or obtain summary judgment evidence on GHA's untimely asserted Good Samaritan affirmative defense. This is the very definition of arbitrary and capricious enforcement of the rules to the prejudice of one of the parties. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1986) ("The test for abuse of discretion is ... whether the court acted without reference to any guiding rules and principles.").

GHA and the majority rely on *Ersek v. Davis & Davis, P.C.,* 69 S.W.3d 268 (Tex. App.-Austin 2002, pet. denied), as authority for sustaining the trial court's ruling striking Dr. Reeves as an expert. *Ersek* is inapplicable here. In that case, the plaintiff knew that his cause of action required expert testimony, yet he waited for over a year after filing his claim to designate his expert. *Id.* at 270. Indeed, the plaintiff contended that he had complied with the discovery rules by filing disclosures "designating no expert witness before the deadline and then supplementing his response identifying [the expert] after the deadline" in response to a motion for summary judgment filed by the defendants. *Id.* at 270–71. In other words, in *Ersek,* the plaintiff tried to sandbag the defendants and got caught. Here, exactly the opposite is the case, and the defendants' behavior here should be rewarded no more than the plaintiff was rewarded in *Ersek.* Rather, I agree with Texas Rule of Civil Procedure 1 that the "[t]he proper objective of rules of civil procedure is to obtain a just, fair, equitable and impartial adjudication of the rights of litigants under established principles of substantive law." Tex.R. Civ. P. 1. I also agree with the Supreme Court of Texas that we should not reward gamesmanship and secrecy. *See Alvarado,* 830 S.W.2d at 915; *Lowry,* 802 S.W.2d at 671.

The majority also relies on *Cunningham,* 185 S.W.3d 7, cited above. Its reliance on that case is also misplaced. As stated above, *Cunningham* holds that if a party fails to timely designate an expert witness "then testimony from that expert will be excluded unless the trial court determines that the party seeking to introduce the evidence established either (1) the existence of good cause for its failure or (2) that it would not unfairly surprise or prejudice the other parties to admit the evidence despite the inadequate discovery." 185 S.W.3d at 11. *Cunningham* lends no support to the trial court's rulings in this case. Indeed, as the *Cunningham* court aptly opined, "A primary purpose of the discovery rules is to prevent trial by ambush." *Id.* at 14; *see also Alvarado,* 830 S.W.2d at 915. That purpose was entirely ignored by both the trial court and the majority, and it does apply here—to GHA, not to the Dos.

I would hold that the trial court's orders striking the Dos' expert, Dr. Reeves, and his affidavits were clearly arbitrary and capricious, and I would sustain the Dos' first issue.

**The Trial Court's Order Striking Portions of Dr. Katz's Affidavit and Overruling the Dos' Objections to GHA's Evidence**

In their second issue, the Dos contend the trial court erred in striking paragraphs 6 and 9 of Dr. Katz's affidavit. Paragraph 9 is set out in part above, and both paragraphs are set out in the majority opinion.

Paragraphs 6 and 9 of Dr. Katz's affidavit constitute the Dos' summary judgment proofs regarding Dr. Riddle's status as an on-call anesthesiologist and as the anesthesiologist charged with administering anesthesiology during the C-section and delivery in this case, the standard of care Dr. Riddle owed S.D. in those circumstances, and his right to charge for his services in administering anesthesiology to the mother and the infants in her body and in intubating S.D. after his birth. In agreeing with the trial court's order striking these paragraphs, the majority cursorily addresses *only* Dr. Katz's opinion regarding Dr. Riddle's right to charge for his services, misconstrues the import of Dr. Riddle's testimony on that point, determines Dr. Katz's testimony is conclusory, and then affirms the order striking all of the critical summary judgment proof contained in these paragraphs with no further argument or citation to authority. It states that "[w]hile Dr. Katz purported to have personal knowledge of the facts recited in his affidavit, his statement regarding Dr. Riddle's entitlement to compensation is a legal conclusion with no supporting facts or rationale," and, therefore, it was properly struck as "conclusory." I would hold that it was error for the trial court to strike any of this vital testimony.

The majority relies on a statement in *McIntyre v. Ramirez*, in which the Supreme Court of Texas held, shortly before GHA filed its motion for summary judgment, that a Maryland doctor was not qualified to testify about "what's ordinarily billed or what the law ordinarily allows people to recover for their medical services in the State of Texas." *McIntyre*, 109 S.W.3d at 750. In *McIntyre*, the defendant obstetrician, Dr. McIntyre, was *not on call*, but happened to be in a hospital labor and delivery area visiting one of his own patients when he responded to an emergency page for Ramirez, whom he had never seen, but who was in the process of delivering an infant with no doctor present; there were indications that the infant's shoulder had become lodged against the mother's pelvic bone, a condition called shoulder dystocia; and the infant, whom Dr. McIntyre delivered after several unsuccessful attempts, suffered neurological impairment as a result of the shoulder dystocia. *See id.* at 743. The Ramirezes' expert, a Maryland obstetrician, opined conclusorily that Dr. McIntyre "was entitled to bill and receive a fee for the delivery of baby Colby Ramirez." *Id.* at 749.

The Supreme Court of Texas first addressed Ramirez's claim that Dr. McIntyre's inability to avail himself of the Good Samaritan statute was established by Dr. McIntyre's testimony that he practiced obstetrical medicine, he routinely delivered babies at the hospital, and he was in the hospital for the purpose of treating his own obstetrical patient, from whom he expected to be compensated, on the day he delivered Colby Ramirez. *Id.* at 749. The court opined, "The testimony cited by Ramirez is not probative of the circumstances of this case, which involved a medical emergency and an absence of any preexisting relationship or duty to respond to that emergency." *Id.* In other words, the

fact that Dr. McIntyre was an obstetrician who was visiting his own patient in the hospital, where he was not on call, did not establish either that he had a pre-existing relationship with Ramirez or that he had a duty to deliver her baby. The unpredicated legal conclusion of Ramirez's expert, an obstetrician practicing in Maryland, "with no supporting facts or rationale" did not raise a fact question sufficient to defeat summary judgment. *Id.* at 749–50.

I have no disagreement with the supreme court's rationale or holding in *McIntyre,* but I disagree with the majority in this case that the rationale of *McIntyre* applies here. The issue under former subsections 74.001(c)(1) and (d) in this case, if it were to be reached, is whether Dr. Riddle had a *legal right* to bill for his services assuming (as I do not) that he intubated S.D. "for reasons wholly unrelated to [his] work in administering health care" and thus was not excluded as a Good Samaritan by former subsection 74.001(c)(1). If he did have a legal right to bill for the post-delivery intubation, he would still be excluded as a Good Samaritan by former subsection 74.001(d), even if his services were entirely voluntary and not part of his job as the on-call anesthesiologist and even if he did not bill for them. Specifically, former subsection 74.001(d) provided that, for purposes of former subsection 74.001(c)(1), "a person who would ordinarily receive or be entitled to receive a salary, fee, or other remuneration for administering care under such circumstances to the patient in question shall be deemed to be acting for or in expectation of remuneration even if the person waives or elects not to charge or to receive remuneration on the occasion in question." Former TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(d). Thus, under former subsections 74.001(c)(1) and (d), if GHA had established that Dr. Riddle was not at the hospital for the purpose of rendering emergency anesthesiology services, such

as intubation, when he intubated S.D.— which it did not prove, in contrast to the *McIntyre* defendant—it would still have had to prove, for purposes of satisfying former subsection 74.001(d), that an on-call staff anesthesiologist, called to deliver emergency anesthesiology services to a patient in Texas, is not legally entitled to charge for those services.

Dr. Katz, having testified to Dr. Riddle's duties as the on-call anesthesiologist for the hospital where S.D. was born and his duties as the member of the delivery team charged with providing anesthesiology and related services during and after the delivery, testified regarding Dr. Riddle's legal right to charge for those services in paragraph 5 of his affidavit, which was *not* struck, and paragraph 6, which was improperly struck:

> 5. *I have knowledge and experience in the practice of medicine and the specialty of anesthesiology.* Thus, I am familiar with the standards of reasonably prudent, ordinary and accepted care for an anesthesiologist. *This includes the standards of an anesthesiologist who is "on call," who is on the medical team for an emergency C-section for the birth of a child, and who is providing anesthesia, intubation, and related services in cases like or similar to the C–Section for Thao Chau and the birth of [S.D.]. These standards of care are national standards,* which apply throughout the country to anesthesiologists who provide medical services like or similar to those which should have been provided for Thao Chau and her child, [S.D.], under the same or similar circumstances.

> 6. *Anesthesiologists are hospital-based doctors, meaning we rarely have offices where we see patients, and usually our medical practice is at a hospital. When we render anesthesia services, we expect to be compensated, whether we perform those services "on call" or dur-*

*ing the regular workday; it is our practice to charge* (or for the hospital to charge if we are salaried and at a teaching facility) *for those services.*

(Emphasis added.)

In the earlier paragraphs of his affidavit and in his curriculum vitae attached to his affidavit, Dr. Katz fully established his credentials for opining as to national standards of care and conditions of service and billing for an on-call anesthesiologist on the staff of a hospital, and opined as to the substance of those national standards, which he explained in detail. He also opined as to his extensive review of the records and materials in the case. Dr. Katz's improperly struck testimony in paragraph 6 is thus entirely unlike the affidavit of the plaintiffs' expert in *McIntyre,* a physician board-certified in Maryland, who opined, without substantiation or credentials, about *local* billing practices in Texas under the unusual circumstances in which the defendant physician who delivered emergency care was in the hospital fortuitously, was *not* on call, and was *not* associated with the delivery team by the attending physician, but merely responded to an emergency call. *McIntyre,* 109 S.W.3d at 749. It is this kind of testimony—not the testimony of an expert on national anesthesiology standards opining on those standards—that the supreme court properly characterized as presenting "a legal conclusion with no supporting facts or rationale" and, therefore, incompetent to defeat summary judgment. *See id.* at 749–50; *see also Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 122 (Tex.1996) (per curiam).

Even without paragraph 6, I would hold that Dr. Katz's testimony raised a material fact issue as to whether Dr. Riddle was legally entitled to charge for the emergency intubation he performed in the course of his work as the on-call anesthesiologist and as the anesthesiologist associated with the labor and delivery team by Dr. Le. However, I would also consider the evidence in paragraph 6, which is, in my view, clearly competent expert testimony by the non-movant's expert on a material fact issue.

Moreover, because I believe the trial court improperly struck Dr. Reeves' affidavit, I would include it also in my analysis. *See Trusty v. Strayhorn,* 87 S.W.3d 756, 764 (Tex.App.-Texarkana 2002, no pet.) ("assuming the failure to timely designate a testifying expert [under docket control order] would bar consideration of that expert's affidavit as summary judgment proof, such a failure is a defect of form to which a party must object and obtain a ruling to preserve error"; it does "not make [the] affidavit incompetent, but inadmissible on proper objection."); *Lection,* 65 S.W.3d at 703 (failure to timely file summary judgment proof is defect of form, not substance). Dr. Reeves reviewed the billing records and testified, in the affidavit struck by the trial court, that Dr. Riddle did, in fact, charge for his professional services for the entire time he spent in the delivery room, including the time spent intubating S.D.—testimony that contradicted Dr. Riddle's testimony in his own affidavit. The majority, having held that Dr. Reeves's testimony was properly struck, does not mention this testimony. I would hold, by contrast, that Dr. Reeves' testimony, too, was more than sufficient to raise a fact issue as to Dr. Riddle's self-serving and conclusory contention—as movant for summary judgment—that he was not entitled to bill for those services.[5]

5. In their third and fourth issues, the Dos contend that the trial court erred in overruling their objections to the affidavits of Dr. Riddle and Marie Walton, the director of the company that provided billing services for GHA. The majority sets out the Dos' objections to these affidavits. I agree with the

I would sustain the Dos' second issue. I would hold that the trial court acted arbitrarily and capriciously in striking paragraphs 6 and 9 of Dr. Katz's affidavit. In addition, if I were to reach the issue of whether GHA bore its burden of proving as a matter of law that Dr. Riddle was not excluded from the protection of the Good Samaritan statute by subsections 74.001(c)(1) and (d), I would hold that it did not carry its burden.

## Conclusion

Because GHA did not establish its Good Samaritan affirmative defense as a matter of law, I would reverse and remand this case for trial on the merits.

majority's statement of the Dos' objections, agree with the objections, and disagree with the majority's conclusion that these affidavits were competent summary judgment evidence. I would not reach this issue, however, because the foregoing issues are dispositive.